[Cite as *Smith v. E.S. Wagner Co.*, 2016-Ohio-8096.]

## IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### DEFIANCE COUNTY

ORVILLE SMITH, ET AL.,

    PLAINTIFFS-APPELLANTS/
    CROSS-APPELLEES,

    v.                                    CASE NO.  4-16-05

E.S. WAGNER COMPANY,

    DEFENDANT-APPELLEE/
    CROSS-APPELLANT,
    -and-                                  O P I N I O N

LEWIS J. WAGNER,

    DEFENDANT-APPELLEE.

---

**Appeal from Defiance County Common Pleas Court**
**Trial Court No. 13-CV-42475**

**Judgment Affirmed**

**Date of Decision:    December 12, 2016**

---

APPEARANCES:

    *R. Kent Murphree and Stephen F. Hubbard* for
                 **Appellants/Cross-Appellees**

    *Matthew D. Harper* for Appellee/Cross-Appellant

**ROGERS, J.**

{¶1} Plaintiffs-Appellants-Cross-Appellees, Orville Smith ("Orville") and Julianne Smith ("Julianne") (collectively "the Smiths"), appeal the judgment of the Court of Common Pleas of Defiance County finding in favor of Defendant-Appellee-Cross-Appellant, E.S. Wagner Company ("E.S. Wagner"), on the Smiths' claims. On appeal, the Smiths argue that the trial court erred by ignoring the plain language of the parties' lease agreement. Additionally, they argue that the trial court erred by applying the legal theory of accord and satisfaction in this case. E.S. Wagner appeals the judgment of the Court of Common Pleas of Defiance County finding in favor of the Smiths on their counterclaim. In its cross-appeal, E.S. Wagner argues that the trial court erred by failing to award E.S. Wagner their attorney fees as compensatory damages. For the reasons that follow, we affirm the judgment of the trial court.

{¶2} On July 18, 2013, the Smiths filed a complaint in the Court of Common Pleas of Defiance County against E.S. Wagner and their statutory agent, Lewis Wagner. In their complaint, the Smiths alleged that E.S. Wagner breached the terms and conditions of a lease entered into by the parties. The Smiths claimed damages exceeding $300,000. The Smiths attached a copy of the lease as an exhibit.

{¶3} On September 17, 2013, E.S. Wagner filed its answer and counterclaim. In their answer, E.S. Wagner denied breaching the lease and raised several

affirmative defenses, including the doctrine of accord and satisfaction. In their counterclaim, E.S. Wagner alleged four separate grounds for relief: (1) breach of contract; (2) promissory estoppel; (3) unjust enrichment; and (4) declaratory judgment and specific performance. In addition to other supposed damages, E.S. Wagner claimed they were entitled to its attorney fees. E.S. Wagner attached copies of the lease, two Memoranda of Understanding ("MOU"), and a release of liability as exhibits.

{¶4} On October 2, 2013, the Smiths filed their response to E.S. Wagner's counterclaim. In their response, the Smiths denied any wrongdoing.

{¶5} The Smiths filed a motion for leave to file an amended complaint on April 7, 2014, which was granted by the trial court.

{¶6} Later that day, the Smiths filed their amended complaint. In their amended complaint, the Smiths added a separate count arguing that E.S. Wagner's breach of contract proximately caused additional and separate damages in excess of $25,000. The Smiths attached a copy of the lease as an exhibit.

{¶7} E.S. Wagner filed their answer to the amended complaint and counterclaim on April 21, 2014. E.S. Wagner denied the allegations and raised the same grounds for relief in their original counterclaim. E.S. Wagner attached the same exhibits as they had in their original answer and counterclaim.

{¶8} A bench trial was held on May 11, 2015 where the following testimony was presented. Orville was the first witness to testify on behalf of the Smiths. Orville testified that he was 83-years old and was a farmer for the past 60 years, although he considered himself semi-retired at trial. He explained that he no longer farmed his land and that he rented it to Andy Shininger who farms the land. Orville stated that he rented approximately 450 acres and it was used to grow corn, beans, and wheat. He added that he and his wife, Julianne, owned 73.416 acres located in the southwest corner of section 22 of Noble Township. He testified that the land abutted U.S. route 24 to the south.

{¶9} Orville testified that he was approached by Mike Pfeiffer, a representative from E.S. Wagner, who explained to him that E.S. Wagner, a construction company, wished to rent a portion of the property located south of U.S. 24 as it wished to bid on a construction project involving U.S. 24.

{¶10} Orville identified a copy of the original lease entered into between the Smiths and E.S. Wagner. Under the lease, E.S. Wagner agreed to pay $2,500 a year for three years to the Smiths in exchange for the use of five acres of the Smiths' property. Specifically, the property was "to be used for storage of material and related items, plus the use of machinery and equipment and requisite personnel required to facilitate construction activities involving The Ohio Department of Transportation (ODOT) Project 008706." Plaintiffs' Ex. A, p. 1. At the expiration

of the lease, E.S. Wagner was required to "[s]urrender the premises * * * in as good condition as the premises [we]re, reasonable wear and tear, and unavoidable casualty excepted." *Id.* The lease was signed on April 4, 2006 with an effective date of April 1, 2006. Orville testified that neither he nor his wife drafted the lease.

**{¶11}** Orville stated that no one from E.S. Wagner discussed the possibility that the land would be used for a crushing yard prior to entering into the lease. He added that he had no idea the effect a crushing yard would have on the property and that he would not have entered into a lease with E.S. Wagner had he known that was their intention. He testified that he never talked with John Perry, another representative from E.S. Wagner, that he never asked Perry if the land would be farmable after the expiration of the lease, and that Perry never told him that the land would no longer be farmable.

**{¶12}** Orville identified a separate lease, entered into between the Smiths and E.S. Wagner, for the use of one acre to be used by E.S. Wagner as a field office. He added that this property/lease was not at issue in this case. He also identified a borrow pit[1] agreement entered into by all parties, which allowed E.S. Wagner to dig for dirt to be used in its project. Again, this property/agreement was not at issue. Finally, he identified an addendum to the original lease, which added another acre

---

[1] A borrow pit is "an excavated area where material (as earth) has been borrowed to be used as fill at another location." *Webster's Third New International Dictionary* 257 (2002).

to the lease. Similar to the original lease, Orville explained that neither he nor his wife drafted these documents.

{¶13} Orville described the condition of the property at the time of the project winding down as being real messy. Specifically, he stated that there were piles of stones and other material in the area. According to Orville, E.S. Wagner wanted to bury the debris. In response to E.S. Wagner, Orville explained that he told them to put it in a nearby ravine, located south of the crushing yard on the Maumee River, and cover it up. He stated that E.S. Wagner moved debris to the ravine, but after a big rainfall the debris was washed out and the ravine had to be fixed. Orville explained that he spoke with John Wagner, a representative of E.S. Wagner, who came and fixed the problem at the ravine.

{¶14} Orville testified that there were still stone piles near the entrance to the site of the crushing yard and that they were the result of E.S. Wagner's use of the property. He admitted that E.S. Wagner asked permission to leave the stones there.

{¶15} Orville identified a copy of a MOU relating to the ravine ("Ravine MOU"). In the Ravine MOU, E.S. Wagner agreed to perform certain work regarding the washout at the ravine. In exchange for this work, the Smiths agreed to execute a written release of liability regarding the ravine in favor of E.S. Wagner. Orville added that he and his wife eventually executed the release.

**{¶16}** Orville identified a copy of a separate MOU relating to the six acres from the two original leases ("Lease MOU"). The Lease MOU provided,

WHEREAS, the parties to this Memorandum of Understanding executed a Business Property Lease dated April 4, 2006, and agreed to the terms and conditions contained therein between E.S. Wagner Company, hereinafter referred to as Lessee, and Orville and Julianne Smith, hereinafter referred to as Lessor; and

WHEREAS, Lessee agreed to surrender the premises at the end of the term of the Lease; and

WHEREAS, Lessor, in addition, orally agreed to allow Lessee to deposit fill material on the leased premises;

NOW THEREFORE the parties to this Memorandum of Understanding agree as follows:

1. That the terms and conditions of the Lease are hereby incorporated by reference into this instrument.
2. Lessor authorizes Lessee to immediately enter upon the premises to facilitate the work described in Paragraph (3).
3. Crushing Yard:

   A. Mechanically rake down the former crushing yard area with the intent of removing unsuitable material (greater than approximately 1.5" in diameter) that may be lying on the land area surface.
   B. Any unsuitable material that is removed from the former crushing yard will be taken to the washout/ravine area and placed within the washed out areas.
   C. Upon the completion of the mechanical rake down, the former crushing yard area will be re-graded.
   D. After the area is graded, Lessee will conduct a final walk around inspection to remove any remaining visible reinforcing steel.

4. That upon completion of the work outlined herein Lessor will sign the unexecuted Release, marked Exhibit A, attached hereto and made a part hereof.

Plaintiffs' Ex. F, p. 1. The Lease MOU was signed by all parties. Orville explained, however, that neither he nor his wife ever signed the release of liability.

{¶17} Orville testified that E.S. Wagner used a bobcat with a rake attachment to go over the property and that this did not do much. He explained that E.S. Wagner raked a little dirt over the property afterwards.

{¶18} Orville stated that he expected the land to be farmable after the expiration of the lease, but admitted that he thought the property might be in rougher shape. Orville identified a quote for $17,560 from Powerscreen, which stated that Powerscreen would provide a machine that would sort ground material into three piles: dirt, large stones, and smaller stones. Orville also identified a quote for $211,616 from Vernon Nagel, Inc. ("Nagel") in exchange for Nagel picking up ground material and putting it through Powerscreen's machine. Orville explained that this work was necessary if the land was to be returned to a farmable state. Orville testified that the property was not farmed for the last five years.

{¶19} On cross-examination, Orville identified a lease option ("the Option"), dated March 1, 2006, signed by E.S. Wagner, Orville, and Julianne. The Option granted E.S. Wagner an exclusive and irrevocable right and option to lease the five-acre property in dispute. Under the terms of the Option, it stated that E.S. Wagner's

"intended use of the premises includes the right to store equipment, material and related items, (including the construction of a concrete crushing plant, to be sublet to a contractor of [E.S. Wagner's] choice) essential to facilitate construction activities * * *." Defendant's Ex. 1. Orville stated that Pfeiffer might have told him that E.S. Wagner would be using the property as a crushing yard, but stated that no one explained to him what a crushing yard was.

{¶20} The defense was granted permission to allow its first witness, Bruce Dunzweiler, to testify out of order. Dunzweiler was declared an expert in real estate appraisal without objection. Dunzweiler testified that he was hired to perform an appraisal of the five acres in dispute. He explained the process by which he performs an appraisal. He concluded that the fair market value of the five-acre property was approximately $22,000 or $4,150 an acre.[2]

{¶21} Upon a brief examination of the court, Dunzweiler clarified that his conclusions were reached under the assumption that the land was usable farm ground.

{¶22} Andrew Shininger was the next witness to testify on behalf of the Smiths. Shininger testified that he has been a farmer for 40 years. He stated that he farmed approximately 800 acres for corn, beans, and wheat. He added that he also was in the excavation business for approximately 25 to 30 years.

---

[2] The parcel of land was actually 5.3 acres.

{¶23} Shininger explained that he was hired by Orville to harvest Orville's crops around 25 to 30 years ago and had done so ever since. He stated that the property in issue was farmable and had been farmed prior to the execution of the lease. He explained that the soil was very fertile and was capable of producing crops.

{¶24} Shininger testified that the property was no longer farmable. He described areas covered in concrete, rebar, and stone where no grass would grow. Shininger stated that the people from E.S. Wagner merely covered up the property with dirt, but did not actually remove the contaminants from the soil. He gave one example where one of the workers ran over a rock in a Bobcat and, instead of moving the rock, the worker got some dirt and laid it on top of the rock.

{¶25} Scott Nagel ("Scott") was the next witness to testify on behalf of the Smiths. Scott testified that he worked for Nagel off and on for the past 25 years. Scott stated that he served as Nagel's Vice President since 2009. His duties included management of the company in general.

{¶26} Scott testified that he was contacted by Shininger in early 2013 regarding the property at issue. Scott explained that he visited the property, which consisted of piles of stone and asphalt, concrete, weeds, and other things growing out of the ground.

{¶27} He gave his opinion about what needed to be done to return the land to a farmable condition. Specifically, he explained that "it needs to have * * * at least a foot or two of material taken up and either replaced with new or screened out, you know the asphalt, the concrete chunks and put back down, you know." Trial Tr., p. 180. Scott identified a copy of the quote that he sent the Smiths to perform the necessary work, which totaled approximately $211,000.

{¶28} At the conclusion of his testimony, the Smiths rested.

{¶29} John Wagner ("John") was the next witness to testify on behalf of E.S. Wagner. John testified that he was the Vice President at E.S. Wagner and had worked for E.S. Wagner his whole life. He added that he was a licensed professional engineer in Ohio. John explained that E.S. Wagner was a heavy highway construction company that typically takes on major roadway projects. He added that he served as the project manager on the U.S. 24 project involved in this case.

{¶30} John testified that they used the leased property in issue primarily as a concrete recycling facility, also known as a crushing yard. He explained that they removed the pavement from U.S. 24, which was broken up at the site, loaded it into trucks, and hauled it to the crushing yard. He added that they stockpiled the material there, hired a subcontractor to crush the material on site, and then used the recycled material for the U.S. 24 project. In other words, John explained that the goal of a crushing yard is to take large rocks and make them into smaller rocks.

{¶31} John stated that the crushing process results in a layer of residue that ends up on the ground. He added that regulations regarding the use of recycled material be free of or only include a small percentage of dirt. Thus, he explained that they had to put a layer of aggregate, which he said consisted of the ground up concrete/pavement, over the crushing yard site. He stated a layer of crushed material will always be left behind as a result. He added that another eventual result was ground compaction from heavy equipment.

{¶32} John stated that he had conversations with Orville while the crushing yard was in operation. He could not recall Orville raising any concerns about the crushing yard or the effects of operating a crushing yard on his property. John described how they would have cleaned up the site after finishing the project. He explained,

> In general, any remaining materials that were not used in the project, and didn't become property of the owner, and I'm talking about pipe and pre-cast drainage structures and things that may have been stacked there on site for use of the project, would have been loaded and hauled off-site. And the equipment that was remaining would have been removed from the site. The site would have been leveled, in which means dressed, so that it would drain properly and then depending on what, you know - - the borrow pit would have been a little bit different, it would have been a little bit of a different situation, but in terms of the crushing facility itself it's pretty basic, you know, restorative process. It's essentially that.

*Id.* at p. 215-216.

{¶33} John testified that he returned to the property in the spring of 2011 after Orville and Shininger mentioned how unhappy they were with the condition of the property. He explained that Orville was unhappy about an erosion problem in the ravine that was caused by E.S. Wagner's disposal of material. Orville was also unhappy about the general condition of the rest of the property. John stated that he examined the property and admitted that they had performed substandard work on the ravine and agreed to restore that portion, but the rest of the property looked fine.

{¶34} John explained that he believed the cleanup performed by E.S. Wagner relating to the property in general was adequate. According to John, the property was draining properly, was dressed, and contained aggregate material, which was expected from the operation of a crushing yard. He explained that dressed meant that the site was smoothed over with either a bull dozer or motor grader, which would result in proper drainage.

{¶35} John testified about each step E.S. Wagner agreed to perform to restore the property further under the Lease MOU. First, E.S. Wagner brought in a skid steer with an attachment to sift through the surface to remove any objects with a diameter of one and a half inches or greater. Then, E.S. Wagner would take any unsuitable material to the ravine or otherwise properly dispose of the material. After the rake down was completed, they would re-grade the crushing yard. Finally, E.S.

Wagner would perform a walkthrough inspection with Orville to remove any visible reinforcing steel that was left behind. He estimated that this additional cleanup cost E.S. Wagner less than $5,000. He added that they completed all the work that was contained in the Lease MOU.

{¶36} John stated that E.S. Wagner performed additional work at the request of Orville that was not contained in the Lease MOU. This work consisted of spreading topsoil over the property and dressing it.

{¶37} On cross-examination, John stated that a skid steer, also known as a Bobcat, was used to scrape the top inch or so of the ground for stones. However, John explained that this corresponded with what E.S. Wagner agreed to do under the Lease MOU.

{¶38} On examination by the court, John indicated that Pfeiffer drafted the two MOUs. John also confirmed that the lease for the additional land for office space stated that E.S. Wagner would return that piece of property in a condition substantially different than it was at the time of delivery to E.S. Wagner.

{¶39} John Perry was the next witness to testify on behalf of E.S. Wagner. Perry stated that he worked for Beaver Excavating out of Canton as a job superintendent. He testified that he used to be employed by E.S. Wagner in the same position and other positions for 21 years. He added that he was the superintendent on the U.S. 24 job.

**{¶40}** Perry testified that he discussed the effect a crushing yard would have on the Smiths' property with Orville. He initially could not remember when he had this conversation, but added that he told Orville that the land would never be able to produce the same amount of crops as before the lease was executed. He later stated that this conversation must have happened after the Smiths signed the lease. He testified that he had never seen the lease and that Pfeiffer was the one responsible for drafting all of E.S. Wagner's documents. According to Perry, Orville indicated that he agreed with Perry that the land would not be in a farmable condition due to the impact of the crushing yard.

**{¶41}** Perry testified about the cleanup he and the rest of his team did at the Smiths' property. Specifically, "[they] hauled material off and * * * hauled all the excess concrete that didn't get crushed into a ravine south of that that was washing out real bad [they] just put in there for erosion protection. We hauled topsoil - - we moved topsoil around. We did quite a bit of work to try to get him sign off on it." *Id.* at p. 280. He added that Orville agreed to let a portion of the property remain unaltered for the most part because Orville was going to use it to store farm equipment.

**{¶42}** Perry explained that as the cleanup progressed it was Shininger and not Orville who was not happy with the work. Perry stated that Shininger complained that there were still too many rocks present that would hurt his farm

equipment. Perry testified that to make Shininger happy he had someone go over the property with a Rome disc, which was used to turn over the soil to reveal any buried rocks. He added that this equipment would dig six inches into the ground.

{¶43} On cross-examination, Perry stated that they used several pieces of heavy equipment during the cleanup phase, including haul trucks, 740's,[3] dozers, two excavators, and others. Perry explained that he was transferred to South Bend, Indiana for approximately two weeks, but returned to the Smiths' property after that period. Perry clarified that this cleanup was the initial cleanup and predated either MOU.

{¶44} Perry testified that he was fired by E.S. Wagner for what he believed was using too many vacation days.

{¶45} On examination by the court, Perry confirmed that Beaver Excavating was a competitor of E.S. Wagner's. He added that in all of his years of experience he had never spent more time or money on a cleanup than he did on the Smiths' property. He concluded that the only thing that could possibly be done to improve the property other than what was done was to remove the top four feet of the ground, bring in new dirt, and then put a foot of topsoil on top.

{¶46} Upon re-direct-examination, Perry explained that using a Bobcat to clean up the property was an extreme measure. He stated that a Bobcat is typically

---

[3] He later clarified that a 740 is a dump truck

used to pick up small rocks and added that it would take a long time to remove all the small rocks off of a five-acre piece of land.

{¶47} On re-cross-examination, Perry looked at the photographs showing the property's condition in 2013 and 2014 and stated that the condition was not acceptable cleanup and restoration of the property. He explained that the large rocks in the photographs were most likely placed there and were never grabbed.

{¶48} On re-direct-examination, Perry testified that the condition of the property when he finished cleanup did not resemble the condition of the property depicted in the photographs. It was his opinion that someone else had either legally or illegally dumped their rocks in there.

{¶49} Michael Pfeiffer was the next witness to testify on behalf of E.S. Wagner. Pfeiffer testified that he led the Business Development section at E.S. Wagner for the past 14 years. He explained that his duties included searching for business opportunities, both public and private, and that he was responsible for the lease agreements that are required for their projects.

{¶50} Pfeiffer stated that the Smiths' property was leased for three reasons: (1) a laydown area; (2) a crushing yard; and (3) equipment storage. He explained that he first approached Orville about the property sometime in late fall of 2005. He added that they initially discussed a potential site for a borrow pit.

{¶51} Pfeiffer identified a copy of the Option, which was put together for the Smiths' "to lease [their] property there for [E.S. Wagner's] crushing yard." *Id.* at p. 320. Pfeiffer testified that he explained to Orville what E.S. Wagner was planning to do with the property if E.S. Wagner got the project during their negotiations, which included the crushing yard. Pfeiffer stated that Orville asked about what would be crushed at the crushing yard, but did not ask about the ultimate effect the crushing yard would have. He continued, "* * *. But I told [Orville], okay, that this crushing operation is going to change the ground. You won't get your production, your farming production that you normally would with this operation." *Id.* at p. 322.

{¶52} Pfeiffer explained that when it came time to sign the lease he went over each line of the lease with both Orville and Julianne individually. He told Orville, "Orville, understand something, the property is going to change. It's not going to be the farm ground that you currently have, the production is going to go down." *Id.* at p. 325. Pfeiffer stated that his father, who was an attorney, drafted the documents.

{¶53} Pfeiffer identified a copy of handwritten notes that he claimed were written by Orville and given to him by Orville. He explained that Orville had come up with a list of things that Orville wanted E.S. Wagner to do to the property before handing the property back to Orville. One of the items included an admission from

Orville that he knew the condition of the property was going to change but wanted E.S. Wagner to cleanup the property so that it could be farmable again. Pfeiffer added that he told Orville again about the fact that the land was going to be used as a crushing yard and that the farm ground would never be the same again.

{¶54} Pfeiffer testified about the Lease MOU and how E.S. Wagner went about cleaning up the property after the parties signed the Lease MOU. Pfeiffer proclaimed that E.S. Wagner completed its end of the bargain, but neither Orville nor Julianne ever signed the release. He explained that Orville asked to have additional work performed on the property, which included having drainage tile replaced, topsoil brought in and spread on the area, etc. He stated that Orville indicated that Orville would sign the release if E.S. Wagner did these things. However, Pfeiffer testified that Orville refused to sign the release even after E.S. Wagner performed the extra work.

{¶55} At the conclusion of Pfeiffer's testimony and the admission of E.S. Wagner's exhibits, the defense rested.

{¶56} On rebuttal, Orville testified on behalf of the Smiths. Orville testified that he and Pfeiffer never discussed that the property was going to be used as a crushing yard prior to signing the lease. He indicated that he was not aware of anyone moving any material on the property after E.S. Wagner returned the

property. He added that he did not see any evidence that suggested E.S. Wagner used a disc during cleanup.

**{¶57}** After Orville testified, the Smiths rested, and the court ordered written closing arguments to be filed with the court.

**{¶58}** Both parties filed their written closing arguments on June 2, 2015.

**{¶59}** By way of entry filed on November 12, 2015, the trial court found in favor of E.S. Wagner on the Smiths' complaint and in favor of the Smiths on E.S. Wagner's counterclaim. In its entry, the court found that the Lease MOU constituted an accord and satisfaction. It reasoned that following the expiration of the lease there was a substantial disagreement between the parties as to whether E.S. Wagner had returned the property in accordance with the lease. Then, the parties entered into the Lease MOU where E.S. Wagner agreed to perform work in exchange for a signed release of liability. The court found that E.S. Wagner performed that work and was entitled to a release. The court noted that it found Perry's testimony highly persuasive given his apparent lack of bias. The court also stated that the judgment could be supported by a finding that the condition of the premises constituted ordinary wear and tear in the context of a crushing yard and that Perry's testimony would further support that conclusion. Regarding attorney fees, the court concluded that attorney fees were never a part of the Lease MOU and, therefore, did not award them to E.S. Wagner.

{¶60} On November 25, 2015, the Smiths filed a request for findings of fact and conclusions of law.

{¶61} The court filed its findings of fact and conclusions of law on February 9, 2016.

{¶62} It is from this judgment that both parties appeal, presenting the following assignments of error for our review.

*The Smiths' First Assignment of Error*

**THE TRIAL COURT ERRED BY IGNORING THE LEASE IN FAVOR OF THE MEMORANDUM OF UNDERSTANDING, AND THEREFORE FAILING TO CONSIDER WHAT CONSTITUTES "REASONABLE WEAR AND TEAR" TO THE PROPERTY.**

*The Smiths' Second Assignment of Error*

**THE TRIAL COURT ERRED AS A MATTER OF LAW IN ITS APPLICATION OF THE LEGAL THEORY OF ACCORD AND SATISFACTION.**

*E.S. Wagner's Cross-Assignment of Error*

**THE TRIAL COURT ERRED IN NOT GRANTING JUDGMENT TO ESW ON ITS COUNTERCLAIM FOR THE SMITHS' BREACH OF THE MEMORANDUM OF UNDERSTANDING RESOLVING THE PARTIES' DISPUTE SURROUNDING REMEDIATION OF THE CRUSHING YARD.**

{¶63} Due to the nature of the Smiths' assignments of error, we elect to address them out of order.

*The Smiths' Second Assignment of Error*

**{¶64}** In their second assignment of error, the Smiths argue that the trial court erred by applying the doctrine of accord and satisfaction to this case. Specifically, the Smiths argue that the Lease MOU was not supported by new consideration, which is required for an accord and satisfaction. We disagree.

**{¶65}** "An accord and satisfaction is a method of discharging a contract or settling a cause of action arising either from a contract or tort, by substituting for such contract or cause of action an agreement for the satisfaction thereof an execution of such substituted agreement." *Kirk Williams Co., Inc. v. Six Industries, Inc.*, 11 Ohio App.3d 152, 153 (2d Dist.1983), citing *Chillicothe Hosp. v. Garrett*, 26 Ohio App.2d 277 (1st Dist.1971). Further, "An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original duty." Restatement of the Law 2d, Contracts, Section 281(1), at 381-382 (1981).

> When an accord and satisfaction is pled by the defendant as an affirmative defense, the court's analysis must be divided into three distinct inquiries. First, the defendant must show that the parties went through a process of offer and acceptance – an accord. Second, the accord must have been carried out – a satisfaction. Third, if there was an accord and satisfaction, it must have been supported by consideration.
>
> Two essential safeguards built into the doctrine of accord and satisfaction protect creditors or injured parties from overreaching debtors or tortfeasors: (1) there must be a good-faith dispute about the

debt, and (2) the creditor must have reasonable notice that the check is intended to be in full satisfaction of the debt.

*Allen v. R.G. Indus. Supply*, 66 Ohio St.3d 229 (1993), paragraphs one and two of the syllabus.

**{¶66}** Like any other contract, an accord must be supported by consideration. *Kirk Williams* at p. 154. "In the case of an unliquidated or disputed demand the consideration rests in part upon the settlement of the dispute. A claim is an 'unliquidated demand,' as the term is used in connection with an accord and satisfaction, if there is a bona fide dispute as to its existence or amount." *Id.*, citing *Morris Skilken & Co. v. Watkins Furniture Co.*, 176 N.E.2d 256 (8th Dist.1961). "If there is not an *actual dispute* between the parties, there cannot be an accord and satisfaction." (Emphasis sic.) *Allen* at 232, citing *West Penn Power Co. v. Nationwide Mut. Ins. Co.*, 209 Pa. Super. 509, 512 (1967). On the other hand, "A liquidated claim is one that can be determined with exactness from the agreement between the parties or by arithmetical process or by the application of definite rules of law." *Huo Chin Yin v. Amino Prods. Co.*, 141 Ohio St. 21, 29 (1943), citing *State v. Massachusetts Bonding & Ins. Co.*, 40 Del. 274, 9 A.2d 77 (1939).

**{¶67}** Finally, " 'When reviewing a civil appeal from a bench trial, we apply a manifest weight standard of review.' " *Lump v. Larson*, 3d Dist. Logan No. 8-14-14, 2015-Ohio-469, ¶ 9, quoting *San Allen, Inc. v. Buehrer*, 8th Dist. Cuyahoga No. 99786, 2014-Ohio-2071, ¶ 89, citing *Revilo Tyluka, L.L.C. v. Simon Roofing &*

*Sheet Metal Corp.*, 193 Ohio App.3d 535, 2011-Ohio-1922, ¶ 5 (8th Dist.). Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C. E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279, 280 (1978). "[W]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24. Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment. *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 81 (1984). However, questions of law are reviewed de novo. *Sayre v. Furgeson*, 3d Dist. Shelby No. 17-15-16, 2016-Ohio-3500, ¶ 12, citing *Warner v. Thomas*, 3d Dist. Shelby No. 17-14-04, 2014-Ohio-3544, ¶ 8.

**{¶68}** In this case, the trial court found that a good faith, bona fide dispute existed as to E.S. Wagner's obligation under the lease. The terms provided that upon the expiration of the lease that E.S. Wagner would return the property in a condition "as good * * * as the premises [we]re, reasonable wear and tear, and unavoidable casualty excepted." Plaintiffs' Ex. A., p. 1. E.S. Wagner believed that it had gone far beyond what was required, but the Smiths believed that E.S. Wagner had to return the property to its original, farmable, condition. There was ample testimony presented to support the trial court's conclusion. After failing to solve

the dispute informally, the parties entered into the Lease MOU, which, as the trial court found, was a separate contract. It is also clear from the record that the claim was unliquidated in nature since there was no way to quantify what constituted the condition of the property.

{¶69} The court found that the Lease MOU constituted the accord. Both parties signed the document, where E.S. Wagner promised to perform certain additional work concerning the property in exchange for the Smiths' promise to sign a release of any potential liability in favor of E.S. Wagner. These facts are also supported by the testimony of both parties to the Lease MOU.

{¶70} The Smiths argue, however, that the Lease MOU was not supported by consideration. There was clearly consideration provided by the Smiths in the way of agreeing to give up any legal rights that may have been violated by E.S. Wagner. *See Kirk Williams*, 11 Ohio App.3d at 154. They contend that E.S. Wagner's promise to provide additional work on the property was not new consideration. Rather, they claim that the additional work was something that E.S. Wagner was legally required to do under the original lease, and, thus, it did not constitute new consideration. As stated supra, there was a bona fide dispute about whether E.S. Wagner had performed its obligations under the contract. Further, the court found that the additional work E.S. Wagner performed was consideration. This was supported by the evidence presented to the trial court.

{¶71} Having found that both parties entered into an accord to settle the dispute, the court found that E.S. Wagner performed the work it promised to do in the accord. This conclusion is supported by the testimony of several witnesses, including Perry, who the court found most credible given his status as a disinterested person that was fired by E.S. Wagner. Thus, E.S. Wagner's work constituted the satisfaction of the agreement. The Smiths, in turn, were required to sign the release, which they failed to do in this case.[4]

{¶72} Having found that the trial court's conclusion of an accord and satisfaction was correct, we overrule the Smiths' second assignment of error.

*The Smiths' First Assignment of Error*

{¶73} Given our resolution of the Smiths' second assignment of error, the Smiths' first assignment of error is rendered moot and need not be considered. App.R. 12(A)(1)(c).

*E.S. Wagner's Cross-Assignment of Error*

{¶74} In E.S. Wagner's sole assignment of error, they argue that the trial court erred by failing to award E.S. Wagner their attorney fees as compensatory damages. We disagree.

---

[4] Our conclusion that the trial court's finding of an accord and satisfaction renders the Smiths' argument that the Lease MOU was not a superseding agreement moot as satisfaction of the accord discharged E.S. Wagner's obligations under the lease and the Lease MOU.

**{¶75}** "Ohio has long adhered to the 'American Rule' with respect to the recovery of attorney fees: a prevailing party in a civil action may not recover attorney fees as part of the costs of litigation." *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, ¶ 7. Exceptions to the rule allow for recovery "when a statute or an enforceable contract specifically provides for the losing party to pay the prevailing party's attorney fees, * * * or when the prevailing party demonstrates bad faith on the part of the unsuccessful litigant * * *." *Id.*

**{¶76}** One exception to the American Rule is when attorney fees are categorized as compensatory damages rather than costs of litigation due to a breach of a settlement agreement. *See Tejada-Hercules v. State Auto Ins. Co.*, 10th Dist. Franklin No. 08AP-150, 2008-Ohio-5066, ¶ 9, citing *Shanker v. Columbus Warehouse Ltd. Partnership*, 2000 WL 726786 (June 6, 2000). In those circumstances, the attorney fees are incurred as damages directly resulting from the party's breach of the settlement agreement. *Id.*

**{¶77}** In this case, E.S. Wagner argues that they are entitled to their attorney fees because the fees were a direct result of the Smiths' breach of the *Lease MOU* and rely primarily on *Shanker*. Upon first glance, the facts seem to support E.S. Wagner's argument. There was a dispute between the parties, which could have resulted in a lawsuit filed by the Smiths. In an attempt to settle the dispute and prevent any possible litigation, E.S. Wagner drafted a document, the Lease MOU.

Under the terms of the Lease MOU, E.S. Wagner promised to perform certain work to the property in dispute. In exchange, the Smiths promised to sign and execute a written release of liability in favor of E.S. Wagner. Both parties signed the *Lease MOU*. The court found, and the evidence presented at trial supports the court's finding, that E.S. Wagner completed the work contained in the Lease MOU. Therefore, the court found that the Smiths were in breach of the *Lease MOU* for failing to sign and execute the written release of liability.

{¶78} Again, the record is clear that the Smiths breached the terms of the Lease MOU by failing to sign and execute the written release. However, this does not necessitate a finding that E.S. Wagner was entitled to their attorney fees as compensatory damages resulting from the Smiths' breach.

{¶79} The language of the Lease MOU is unambiguous. Under the Lease MOU, "upon completion of the work outlined herein [the Smiths] will sign the unexecuted Release * * *." Plaintiffs' Ex. F, p. 1. Accordingly, the Smiths' obligation under the Lease MOU was the promise to sign and execute a separate document. The Lease MOU does not release E.S. Wagner of liability. Rather, it is the unexecuted written release that removes any liability from E.S. Wagner. The Smiths have yet to sign that document. As of now, the Smiths never agreed to give up any potential right to file a lawsuit. Therefore, this case is distinguishable from

*Shanker* and the like because there was never a signed agreement to end litigation, either pre or post-filing of the action.

{¶80} The outcome of this case would be different had the Smiths signed the written release and then filed their case. In that instance, the Smiths would have breached the written release and not the Lease MOU, bringing it within the purview of *Shanker*. In this case, however, E.S. Wagner contended that the Smiths were in violation of the Lease MOU and requested a judgment

> directing that [the Smiths] execute and deliver the release required by the Memorandum of Understanding relating to the 'crushing yard' area to [E.S. Wagner] and, if [the Smiths] nonetheless refuse to do so, directing the act to be done at [the Smiths'] cost by some other person appointed by the Court and/or deeming such execution and delivery to have occurred as a matter of law * * *.

(Docket No. 15, p. 10). Given the Smiths' breach of the Lease MOU, E.S. Wagner was entitled to this judgment, but not its attorney fees.

{¶81} Accordingly, we overrule E.S. Wagner's cross-assignment of error.

{¶82} Having found no error prejudicial to either the appellants or cross-appellant, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**