[Cite as *Horstman v. Fanning*, 2019-Ohio-2483.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

TED HORSTMAN ET AL.,

    PLAINTIFFS-APPELLEES,          CASE NO. 12-18-14

    v.

DAVID FANNING,                  O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Putnam County Common Pleas Court
Trial Court No. 17 CV 102

**Judgment Affirmed**

**Date of Decision:    June 24, 2019**

APPEARANCES:

    *Richard M. Kerger and Kimberly A. Conklin* **for Appellant**

    *Bruce Comly French* **for Appellees**

**PRESTON, J.**

{¶1} Defendant-appellant, David Fanning ("Fanning"), appeals the October 24, 2018 judgment of the Putnam County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case stems from a business dispute between plaintiffs-appellees, Ted and Rick Horstman ("Ted" and "Rick") (collectively the "Horstmans"), Fanning, and a fourth individual, Vincent Snell ("Snell"). Ted, Rick, Fanning, and Snell were members of Ultimate Systems, Ltd. ("Ultimate Systems"), an Ohio limited liability company that produced colorized rubber materials and end-user products such as rubber flooring. (*See* Doc. No. 48, Snell's Sept. 13, 2018 Depo., Ex. B). Each held a 25 percent member interest in Ultimate Systems. (*Id.*). In 2013, a plan was devised to "freeze" Snell out of Ultimate Systems. (*See* Oct. 19, 2018 Tr. at 8). Robert Honigford ("Honigford"), Ultimate Systems's chief financial officer and corporate attorney, was the "mouthpiece" of the scheme to acquire Snell's interest in Ultimate Systems. (*Id.* at 8-9). In late 2013, Snell's 25 percent interest in Ultimate Systems was "eliminated in exchange for a payment of $525,000" based upon a valuation provided by an accounting firm hired by Honigford. (Doc. No. 48, Snell's Sept. 13, 2018 Depo., Ex. B). The acquisition of Snell's interest in Ultimate Systems was accomplished in conjunction with a merger between Ultimate Systems and RDT Manufacturing, LLC ("RDT"), an entity

owned equally by Ted, Rick, and Fanning, with RDT as the surviving entity. (*Id.*). In 2014, the assets of RDT, along with the assets of other entities owned by the Horstmans and Fanning, were sold to a subsidiary of Accella Performance Materials, Inc. ("Accella") for $40 million. (*Id.*); (Doc. No. 19, Ted's Jan. 25, 2018 Depo. at 8-9).

{¶3} Soon after the Accella transaction was consummated, Snell, through Lynx Services, Ltd. ("Lynx"), a company he had previously formed to hold his interest in Ultimate Systems, filed a complaint against the Horstmans and Fanning in the United States District Court for the Northern District of Ohio alleging that the plan to freeze him out of Ultimate Systems violated Ohio law. (*See* Oct. 19, 2018 Tr. at 8-9); (*See* Doc. No. 28, Ex. A). Honigford was later added as a defendant to the federal lawsuit. (*See* Doc. No. 28, Ex. A).

{¶4} In late September 2016, Snell was subjected to deposition in Columbus, Ohio. The Horstmans and Fanning were present at Snell's deposition; Honigford was not. (*See* Oct. 19, 2018 Tr. at 11, 37). On September 30, 2016, the second day of Snell's deposition, Snell, Fanning, and the Horstmans met privately to discuss the possibility of settling the federal lawsuit. (*Id.* at 11). (*See* Sept. 30, 2016 Tr. at 3). Eventually, Snell, Fanning, and the Horstmans agreed that Lynx would dismiss the federal lawsuit in exchange for $4.5 million. (Oct. 19, 2018 Tr. at 11, 37). That day, the parties recited the general terms of their settlement agreement into the

record. (Sept. 30, 2016 Tr. at 3-5). Later, the parties executed a "Global Settlement Agreement and General Release" providing that Lynx would dismiss the federal lawsuit with prejudice in exchange for $4.5 million, $3 million of which was due on or before November 15, 2016 and $1.5 million of which was due on or before April 30, 2017. (Doc. No. 21, Ex. G). Neither the settlement agreement as recited into the record nor the written settlement agreement specify who was responsible for paying what percentage of the $4.5 million. According to the Horstmans and Snell, the Horstmans were to be responsible for paying $1.5 million each, Fanning was to pay $1.5 million, and Honigford was not to pay any part of the $4.5 million. (*See* Doc. No. 21, Ex. E); (*See* Oct. 19, 2018 Tr. at 13-14, 21-23). According to Fanning, however, he never agreed to contribute a specific sum toward the $4.5 million settlement, and he did not agree that Honigford should not have to pay at all. (*See* Fanning Affidavit at 4).

**{¶5}** After the parties adopted the written settlement agreement, the Horstmans each paid $1.5 million to Lynx.[1] Subsequently, on or about April 22, 2017, Fanning advised the Horstmans that he did not intend to pay Lynx the remaining $1.5 million. (Doc. Nos. 1, 7). As a result, the Horstmans decided to

---

[1] The written settlement agreement provided that Lynx would move to dismiss the federal lawsuit within one day after receiving the "Initial Payment" of $3 million due in November 2016. (*See* Doc. No. 21, Ex. G). Although $1.5 million of the $4.5 million remained outstanding in November 2016, because the Horstmans made the required $3 million Initial Payment in November 2016, the federal lawsuit was dismissed with prejudice in November 2016.

split the remaining $1.5 million payment evenly, with Ted and Rick each paying Lynx an additional $750,000.  (Oct. 19, 2018 Tr. at 16).

{¶6} On June 22, 2017, the Horstmans filed a complaint in the trial court against Fanning requesting a judgment for $1,501,748.73 plus interest.[2]  (Doc. No. 1).  On August 4, 2017, Fanning filed his answer to the Horstmans' complaint. (Doc. No. 7).

{¶7} On March 26, 2018, the Horstmans filed a motion for summary judgment.  (Doc. No. 21).  On April 24, 2018, Fanning filed a memorandum in opposition to the Horstmans' motion for summary judgment as well as a cross-motion for summary judgment.  (Doc. No. 28).  On May 7, 2018, the Horstmans filed a memorandum in opposition to Fanning's cross-motion for summary judgment.  (Doc. No. 29).  On May 9, 2018, Fanning filed a brief in reply to the Horstmans' memorandum in opposition to his cross-motion for summary judgment. (Doc. No. 31).

{¶8} Following a May 10, 2018 hearing on the motions for summary judgment, the trial court partially granted the Horstmans' motion for summary judgment. (Doc. No. 33).  First, the trial court found that the Horstmans and Fanning "agreed to the settlement amount and incorporated that agreement on the record and

---

[2] The additional $1,748.73 represents "taxes due to an adjustment to the December 31, 2014, Form 1040 for RDT Manufacturing, LLC in the sum of one-third (1/3) of $1,290.68; and the sum for additional attorneys' fees from Bugbee & Conkle in the aggregate sum of $1,318.50."  (Doc. No. 1).

as a future written settlement agreement" but that "[t]he settlement agreement was silent as to the contribution amounts as it would pertain to any of the parties." (*Id.*). The trial court concluded that the Horstmans had established that "an agreement to pay a settlement in the Federal case does exist." (*Id.*). In essence, the trial court concluded that the only issue in dispute was the precise amount of money Fanning would be required to pay toward the $4.5 million settlement. (*See id.*). Consequently, the trial court denied the Horstmans' motion for summary judgment in part so that the parties could "be heard on the matter as to contribution." (*Id.*). Finally, the trial court denied Fanning's cross-motion for summary judgment in its entirety. (*Id.*).

{¶9} On October 19, 2018, a bench trial was held to determine the sole "remaining issue before the Court" which was "the allocation of contribution on [the Horstmans'] Complaint for Money Damages." (Doc. No. 56). On October 24, 2018, the trial court entered judgment for the Horstmans in the amount of $1.5 million. (*Id.*).

{¶10} Fanning filed a notice of appeal on November 21, 2018. (Doc. No. 64). He raises one assignment of error for our review.

**Assignment of Error**

**The trial court's judgment is against the manifest weight of the evidence and contrary to law.**

{¶11} In his assignment of error, Fanning argues that the trial court's judgment in favor of the Horstmans is against the manifest weight of the evidence or otherwise contrary to law. Specifically, Fanning argues that "in the absence of proof of an agreement as to the amounts to be paid by each settling defendant, a judgment against [him] for $1.5 million is improper." (Appellant's Brief at 8). Furthermore, he argues that the trial court's judgment is contrary to law because it is based on a conclusion that Honigford, as an employee of Ultimate Systems, could not have been compelled to make payments toward the settlement agreement. (*Id.* at 11). Fanning contends that this conclusion is erroneous as a matter of law. (*See id.*). Finally, Fanning argues that even if he did agree to pay $1.5 million, this agreement would be unenforceable under R.C. 1335.05, Ohio's Statute of Frauds. (*Id.* at 13-14).

{¶12} "'When reviewing a civil appeal from a bench trial, we apply a manifest weight standard of review.'" *Lump v. Larson*, 3d Dist. Logan No. 8-14-14, 2015-Ohio-469, ¶ 9, quoting *San Allen, Inc. v. Buehrer*, 8th Dist. Cuyahoga No. 99786, 2014-Ohio-2071, ¶ 89, citing *Revilo Tyluka, L.L.C. v. Simon Roofing & Sheet Metal Corp.*, 193 Ohio App.3d 535, 2011-Ohio-1922, ¶ 5 (8th Dist.). "'[A] civil judgment "supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."'" *Id.*, quoting *Warnecke v. Chaney*,

194 Ohio App.3d 459, 2011-Ohio-3007, ¶ 13 (3d Dist.), quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

**{¶13}** "''"[W]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct."'" *Id.* at ¶ 10, quoting *Warnecke* at ¶ 13, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24. "'The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflection, and gestures.'" *Id.*, quoting *Warnecke* at ¶ 13, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "''"A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court."'" *Id.*, quoting *Warnecke* at ¶ 13, quoting *Seasons Coal Co.* at 81. "''"A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not."'" *Id.*, quoting *Warnecke* at ¶ 13, quoting *Seasons Coal Co.* at 81.

**{¶14}** We conclude that competent, credible evidence supports the trial court's $1.5 million judgment in favor of the Horstmans. At the outset, we acknowledge the trial court's finding that "[t]here were never any discussions as to who would pay what percentage of the $4,500,000." (Doc. No. 56). We also recognize that both the written settlement agreement and the agreement as recited

into the record fail to include provisions allocating responsibility for paying the $4.5 million between the Horstmans, Fanning, and Honigford. Nevertheless, the record supports that at the time the settlement agreement was finalized, it was understood that Ted, Rick, and Fanning would each be responsible for paying Lynx $1.5 million and that Honigford would not be required to pay any part of the $4.5 million. Thus, the trial court's conclusion that Fanning should reimburse the Horstmans for the $1.5 million they paid to discharge his obligation under the settlement agreement is not against the manifest weight of the evidence.

{¶15} The testimony of Snell and Ted, as well as other documentary evidence submitted during the case, support that it was the parties' understanding that Fanning would be required to pay $1.5 million and Honigford would be required to pay nothing. In connection with their motion for summary judgment, the Horstmans submitted an affidavit executed by Snell that provides:

> [D]uring September 2016, a meeting took place between myself, [Ted], [Rick], and [Fanning].
>
> The purpose of the meeting was to agree [to] an out of court settlement. After some negotiations, it was agreed that a payment of $4.5 million would be paid.
>
> It was agreed by Ted and Rick Horstman that they would settle their share of $3 million within 30 days, Dave Fanning asked if I would

> wait until the end of April 2017 for him to settle his share of $1.5 million as he said it would take about six months to get that amount realized.
>
> I agreed to this and then reported our agreement and payment terms to my lawyer * * *.

(Doc. No. 21, Ex. E). Snell's deposition testimony further supports that this was the arrangement contemplated by the parties present at the settlement negotiations. In his deposition testimony, Snell confirmed that he, the Horstmans, and Fanning negotiated to settle the federal lawsuit for $4.5 million. (*See* Doc. No. 48, Snell's Sept. 13, 2018 Depo. Tr. at 8-9). Snell testified that the terms of the agreement were that he "wanted all the cash immediately." (*Id.* at 9). According to Snell, the Horstmans said that they could have their share within a matter of days but Fanning "said, * * * after it was agreed, he would need approximately six months to realize his share of it, which was a third, because we were talking * * * one and a half million dollars each." (*Id.*). He testified that he expected to receive the final installment of $1.5 million from Fanning in April 2017 and that he incentivized Fanning to get the money to him sooner by providing a $5,000 per month discount for early payment. (*Id.* at 9-10). Snell stated: "The agreement was [that Fanning] was going to pay [Snell] one and a half million at the end of April the following

year." (*Id.* at 14). He testified that he believed that the terms of the agreement and the parties' understanding of the agreement were "crystal clear." (*Id.*).

{¶16} On cross-examination, Snell acknowledged that Honigford was also a defendant in the federal lawsuit. (*Id.* at 24-25). However, he testified that Honigford was not present at the settlement negotiations and that it was his understanding that the $4.5 million payment was to be divided between the three defendants present at the deposition, namely the Horstmans and Fanning. (*Id.* at 28). Furthermore, Snell testified that he remembered hearing Fanning state that he would pay $1.5 million. (*Id.*). Finally, Snell stated that he later called Fanning to "make sure that the one and a half million was still coming along" but that he had not spoken to Fanning since. (*Id.* at 32-33).

{¶17} Ted's deposition testimony and trial testimony further corroborate Snell's account of the settlement negotiations and the agreement reached by the parties. Ted remembered the settlement negotiations as follows:

> So after an hour's worth of discussion, we came upon a number * * *. And that number was $4.5 million, of which Rick and I were going to pay 1.5 apiece * * * and get that done because it was going to take a while for us to get our money out of our different entities to get a $1.5 million, we needed a month so that gave it to October 31.

> Mr. Fanning, because he had just purchased a company, * * * said,
> Vince, I need more time, * * * because I'm just purchasing a company,
> I don't have the money right now. * * * Vince gave him an additional
> six months, th[at] being the * * * end of April deadline.
> Vince Snell also said, I tell you what, I'll give you $5,000 a month
> credit for every month before April that you can pay me off.

(Doc. No. 19, Ted's Jan. 25, 2018 Depo. Tr. at 20-21). (*See* Oct. 19, 2018 Tr. at 11-13). Ted insisted repeatedly that at the end of the September 30, 2016 settlement negotiations, they "ended up settling [on] 4 and a half, which was a million and a half a piece" with the understanding that he and Rick "were each to pay a million and a half, [and] Mr. Fanning was to pay a million and a half, with a $30,000 incentive if he could pay it off early." (Oct. 19, 2018 Tr. at 11-12). Ted testified that he did not question why the written settlement agreement failed to specify who would be responsible for paying what portion of the $4.5 million "[b]ecause as [they] were all in the room, the four of [them], that would be Mr. Snell, Rick, [Fanning], and [himself], [they] had [their] agreement amongst [themselves]. * * * [They] decided how it was going to be settled." (Doc. No. 19, Ted's Jan. 25, 2018 Depo. Tr. at 25). He remarked that Fanning understood that the $1.5 million due in April 2017 was "his portion to pay." (*Id.* at 28).

{¶18} As to Honigford's payment obligations under the settlement agreement, Ted testified that Honigford "wasn't involved in the pay-out" to Snell at all because "[h]e was not an owner" of Ultimate Systems. (*Id.* at 22). He stated that "it was agreed upon between [Rick], and [Fanning], and [himself], [that] Mr. Honigford was just the attorney, he had nothing in it." (*Id.* at 22-23). According to Ted, the parties understood that Honigford did not "have the asset base" to pay into the settlement. (*Id.* at 23). Ted testified that he knew that Honigford would agree to the terms of the settlement agreement because "when the four of [them] came out of that room with an agreement, it was * * * one million and a half dollars for [himself], one million and [a] half dollars for Rick, and one million and a half dollars for Dave Fanning"; it was "agreed there would be no contribution by Mr. Honigford" and "nothing [was] coming out of his pocket." (Oct. 19, 2018 Tr. at 23). He stated that Honigford's ultimate assent to the terms of the settlement agreement was based on Honigford's understanding that he would not be liable for any part of the $4.5 million. (*See id.* at 13-14). Finally, Ted testified that Fanning did not say or do anything at the settlement negotiations suggesting that he was dissatisfied with the arrangement obligating him to pay $1.5 million and he did not suggest that Honigford should pay some portion of the $4.5 million. (*Id.* at 17-18).

{¶19} In contrast, Fanning's recollection of the settlement negotiations and the arrangement agreed to by the parties deviates significantly from the version

advanced by Ted and Snell. Fanning's version of events is well summarized by an affidavit he submitted with his cross-motion for summary judgment. His affidavit provides, in relevant part:

> Ted, Rick, [Snell], and I went into a room without lawyers and Ted announced that [Snell] wanted $5 million to settle and we were offering $4.5 million. [Snell] said okay and the conversation went on about how 3 million would get paid in 30 days and then the rest by April of 2017.
>
> There was never an agreement as to how the 4.5 million would be paid among the four Defendants- and since Honigford was not even at this meeting my assumption was that we would work it out later. I recall Ted suggesting that we all pay an even 1.5 million, but that left Honigford out and I never agreed to it. Later Ted informed me that Honigford "couldn't pay" so we were just going to forget about him and so I had to pay $1.5 million. At no time did I agree to pay 1.5 million towards the settlement.

(Fanning Affidavit at 4).

{¶20} In his deposition testimony and trial testimony, Fanning reiterated that, with respect to the division of responsibility for paying the $4.5 million settlement, they "never agreed upon who owed what." (Doc. No. 20, Fanning's Jan. 25, 2018

Depo. Tr. at 41). (*See* Oct. 19, 2018 Tr. at 44). He testified that there was an agreement that the federal lawsuit would be settled but that "there was no package put together" concerning how payment for the $4.5 million would be allocated. (Doc. No. 20, Fanning's Jan. 25, 2018 Depo. Tr. at 44). Fanning stated that he was silent throughout the settlement negotiations until it was generally agreed that the federal lawsuit would be settled for $4.5 million, at which point he "just told them [he] had all [his] money tied up and there was no way [he] could do it." (Oct. 19, 2018 Tr. at 39-40, 42-43). Fanning conceded, however, that during the settlement negotiations, he never said that he was not going to pay anything toward the $4.5 million and he never expressed the "slightest concern on [his] part about paying the bill." (*Id.* at 44-45). He further acknowledged that he owes "some" obligation to pay a portion of the $4.5 million, but he testified that he never specifically agreed to pay $1.5 million. (Doc. No. 20, Fanning's Jan. 25, 2018 Depo. Tr. at 57-59, 70).

{¶21} Fanning disputed Ted's and Snell's testimony that the $1.5 million due in April 2017, along with the $5,000 per month discount for early payment, was meant to accommodate his inability to pay $1.5 million in 2016. Fanning testified that all "that was said [was that Ted and Rick would] pay in 30 days * * * and then six months from now 1.5." (Oct. 19, 2018 Tr. at 50). He insisted that it was not his understanding that he would have to pay the $1.5 million due in April 2017 but that "it * * * just laid out on the table that's just how the payments would go." (*Id.*).

According to Fanning, "[i]t was never laid out who was going to do what, when and where. * * * It was just lump numbers." (*Id.*). Nevertheless, he testified that it was "probably" a "perfectly fair conclusion" that, because the Horstmans were paying $1.5 million each and there was $1.5 million "out there for six months," he was responsible for paying the $1.5 million due in April 2017. (*Id.* at 51).

{¶22} Finally, regarding Honigford's potential responsibility to pay a portion of the $4.5 million, Fanning testified that "Ted said that Honigford didn't have any money so [they were] not even going to ask him" to pay. (*Id.* at 56). Fanning stated that he believed that he should ask about Honigford's contribution but that he did not ask and he did not know why he did not ask other than that the Horstmans were "driving" the settlement negotiations. (*Id.*). Fanning testified that there was no conversation during the settlement negotiations about whether Honigford would contribute to the settlement agreement. (*Id.* at 58). He testified that he believed that he suggested that Honigford pay something toward the settlement but he could not remember when he said so. (*Id.*). However, Fanning stated that he did not express concern that Honigford was absent from the settlement discussions. (*Id.* at 37).

{¶23} In this case, the trial court was tasked with selecting between two competing narratives. In one, the version urged by the Horstmans, it was clearly understood by all parties at the time the settlement agreement was finalized that the $4.5 million payment would be divided equally between Ted, Rick, and Fanning

and that Honigford would not be liable for any share of the $4.5 million. In the other, promoted by Fanning, the parties agreed that $4.5 million would be paid to Lynx but there was no understanding as to who would be responsible for paying what portion of the $4.5 million. Ultimately, the trial court credited the Horstmans' version of events over Fanning's, and as detailed above, there is ample evidence in the record supporting the trial court's decision to do so. Therefore, the trial court's conclusion that Fanning incurred a $1.5 million obligation under the settlement agreement and that he should reimburse the Horstmans for paying his obligation is not against the manifest weight of the evidence.

{¶24} In addition to arguing that the trial court's judgment is against the manifest weight of the evidence, Fanning also argues that the trial court's judgment is contrary to law. First, Fanning argues that the trial court's judgment is contrary to law because it is based, at least in part, on the trial court's incorrect legal conclusion that Honigford "was an employee of the business and would not have responsibility to contribut[e] to the settlement." (Doc. No. 56). Fanning's argument is without merit. Assuming (without deciding) that Fanning is correct that the trial court erred by concluding that Honigford would not have responsibility to contribute to the settlement because he was merely an employee of Ultimate Systems, such error would have no impact on whether Honigford has a responsibility to pay any part of the $4.5 million. Here, Honigford's liability, or lack thereof, is not rooted in

general principles of employment or agency law. Rather, Honigford is not responsible for paying a portion of the $4.5 million settlement because the parties agreed that Honigford would bear no responsibility for any part of the $4.5 million. Thus, even if Honigford would be liable under the default rules of employment or agency law, the parties, through their arrangement, bypassed those rules.

{¶25} Furthermore, Fanning argues that the trial court's judgment is contrary to law because any oral agreement he may have made to pay $1.5 million is unenforceable under R.C. 1335.05, Ohio's Statute of Frauds. Specifically, Fanning argues that any promise to pay Lynx $1.5 million would necessarily include a promise to pay part of Honigford's share of the $4.5 million settlement figure. (Appellant's Brief at 13-14). He contends that "[b]y agreeing to let Honigford out without paying a dime, [he] would not have been serving his own business or pecuniary interest * * *." (*Id.* at 14). According to Fanning, "any promise * * * to pay [Honigford's] share would have needed to be in writing and signed pursuant to R.C. 1335.05." (*Id.*).

{¶26} Fanning's argument is misplaced. R.C. 1335.05 provides:

No action shall be brought whereby to charge the defendant, upon a special promise, to answer for the debt, default, or miscarriage of another person * * * unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and

signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

Thus, the existence of a promise to answer for a "debt, default, or miscarriage of another person" is essential to the applicability of R.C. 1335.05. Under the trial court's factual findings, which, as discussed above, are supported by competent, credible evidence, Honigford did not incur any debt in connection with the federal lawsuit. The entire debt owed to Lynx, $4.5 million, arose from the settlement agreement and was divided equally between Fanning and the Horstmans. Therefore, Fanning's assent to paying $1.5 million was not a promise to answer for the debt of another; it was a promise to pay his own debt and his own debt alone.

**{¶27}** Fanning's assignment of error is overruled.

**{¶28}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ZIMMERMAN, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**