[Cite as *Lump v. Larson*, 2015-Ohio-469.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

CHAD LUMP,

    PLAINTIFF-APPELLEE,         CASE NO. 8-14-14

v.

KEVIN LARSON,               O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Logan County Common Pleas Court

Trial Court No. CV 13 09 0311

**Judgment Affirmed**

**Date of Decision: February 9, 2015**

APPEARANCES:

    *Terrence G. Stolly* **for Appellant**

    *Daniel L. Bennett* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Kevin Larson ("Larson"), appeals the June 5, 2014 judgment entry of the Logan County Court of Common Pleas granting judgment in favor of plaintiff-appellee, Chad Lump ("Lump"), in the amount of $1,731.75. For the reasons that follow, we affirm.

{¶2} On August 6, 2013, in the Bellefontaine Municipal Court, Lump filed a complaint against Larson for unpaid rent and utilities on a commercial lease under which Lump was the landlord and Larson was the tenant. (Doc. No. 1).

{¶3} On September 5, 2013, Larson filed an answer and counterclaim. (*Id.*). In his counterclaim, Larson set forth counts of conversion and tortious interference with business relationships. (*Id.*). Larson's conversion count stemmed from Lump's alleged refusal to return equipment of Larson's remaining at the leased premises. (*Id.*). Larson's tortious-interference-with-business-relationships count stemmed from business opportunities that Larson allegedly lost due to his inability to access the equipment remaining on the leased premises. (*Id.*).

{¶4} On September 10, 2013, the Bellefontaine Municipal Court granted Larson's motion to transfer the case to the Logan County Court of Common Pleas. (*Id.*).

{¶5} On September 27, 2013, Lump filed an "answer" to Larson's counterclaim. (Doc. No. 10).

{¶6} Following a May 16, 2014 bench trial, the trial court on June 5, 2014 filed the judgment entry that is the subject of this appeal. (Doc. No. 58). In it, the trial court concluded that Larson was entitled to $4,868.25 as an equitable award for his "having to procure equipment for a second time to remove his personal property from [Lump's] premise." (*Id.*). The trial court concluded that Lump was entitled to $6,660.00 "for rent and utilities as of May 31, 2013," an arrearage to which Larson admitted. (*Id.*). The trial court offset the awards and entered judgment in favor of Lump in the amount of $1,731.75. (*Id.*).

{¶7} Larson filed his notice of appeal on July 2, 2014. (Doc. No. 70). He raises one assignment of error for our review.

## Assignment of Error

**The trial court erred in denying defendant-appellant's damages for his tortious interference with a business relationship claim as its decision was against the manifest weight of the evidence. Appendix A: Trial Court's Judgment Entry, June 5, 2014**

{¶8} In his assignment of error, Larson argues that we should reverse the trial court's decision "because the ruling that Larson sought the gross amount of the contracts and not lost profits is not supported by any competent and credible evidence and because Larson proved lost profits to a reasonable degree of certainty." (Appellant's Brief at 6). Larson argues that he proved the amount of

profits he lost under two agreements—one with Accelerated Laboratory Relocations ("Accelerated") and another with Dan Schindewolf ("Schindewolf")—based on Larson's inability to perform his obligations under those agreements because he could not access his equipment that remained on the leased premises.

{¶9} "When reviewing a civil appeal from a bench trial, we apply a manifest weight standard of review." *San Allen, Inc. v. Buehrer*, 8th Dist. Cuyahoga No. 99786, 2014-Ohio-2071, ¶ 89, citing *Revilo Tyluka, L.L.C. v. Simon Roofing & Sheet Metal Corp.*, 193 Ohio App.3d 535, 2011-Ohio-1922, ¶ 5 (8th Dist.). *See also Parrott v. Jones*, 5th Dist. Licking No. 13-CA-110, 2014-Ohio-3220, ¶ 27 (applying the manifest-weight standard of review in an appeal from a civil judgment, entered after a bench trial, concluding that the plaintiff failed to establish the elements of tortious interference with a business relationship). "[A] civil judgment 'supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.'" *Warnecke v. Chaney*, 194 Ohio App.3d 459, 2011-Ohio-3007, ¶ 13 (3d Dist.), quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{¶10} "'[W]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the

trier of fact are correct.'" *Id.*, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24. "The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflection, and gestures." *Id.*, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court.'" *Id.*, quoting *Seasons Coal Co.* at 81. "'A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.'" *Id.*, quoting *Seasons Coal Co.* at 81.

{¶11} "In Ohio, the tort of interference with business relationships occurs when an individual, without privilege to do so, 'induces or otherwise purposely causes a third person not to enter into or continue a business relation with another.'" *McCulloch v. Janney Montgomery Scott L.L.C.*, 7th Dist. Columbiana No. 13 CO 40, 2014-Ohio-4002, ¶ 38, fn. 1, quoting *Reali, Giampetro & Scott v. Soc. Natl. Bank*, 133 Ohio App.3d 844, 852 (7th Dist.1999), quoting *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995). "The elements of that cause of action are: '(1) a business relationship or contract; (2) the wrongdoer's knowledge of the relationship or contract; (3) the wrongdoer's intentional and improper action taken to prevent a

contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages.'" *Id.*, quoting *Elite Designer Homes, Inc. v. Landmark Partners*, 9th Dist. Summit No. 22975, 2006-Ohio-4079, ¶ 31.

{¶12} "Ohio law recognizes that a plaintiff may recover all damages proximately caused by an actor's misconduct in a tortious interference action." *UZ Engineered Prods. Co. v. Midwest Motor Supply Co., Inc.*, 147 Ohio App.3d 382, 2001-Ohio-8779, ¶ 54 (10th Dist.), citing *Gray-Jones v. Jones*, 137 Ohio App.3d 93, 102 (10th Dist.2000) and *Brookeside Ambulance, Inc. v. Walker Ambulance Serv.*, 112 Ohio App.3d 150, 157-158 (6th Dist.1996). "Damages for intentional interference with business relations can include 'lost profits, reduced by the expenditures saved by not having to produce that profit, if both the existence of the loss and the dollar amount of the loss are proven to a reasonable certainty.'" *Ohio Vestibular & Balance Ctrs., Inc. v. Wheeler*, 6th Dist. Lucas No. L-11-1320, 2013-Ohio-4417, ¶ 46, quoting *UZ Engineered Prods. Co.* at ¶ 55, citing *Digital & Analog Design Corp. v. N. Supply Co.*, 44 Ohio St.3d 36, 40 (1989). "'A plaintiff may not merely assert that it would have made a particular amount of profits, but must prove lost profits with calculations based on facts.'" *Id.*, quoting *UZ Engineered Prods. Co.* at ¶ 55, citing *Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65, 68 (1988).

{¶13} At trial, Lump called Schindewolf, who operates a trucking company, Schindewolf Express. (May 16, 2014 Tr. at 14-15). When asked by Lump's counsel whether he has "ever done any business with Mr. Larson," Schindewolf responded, "I've never done any business with Mr. Larson. I've had a quote for some business, but I've never done any business." (*Id.* at 14). On cross-examination, Schindewolf admitted that he and Larson "talked about this deal," but Schindewolf did not "know why [Larson] couldn't perform." (*Id.* at 17). When Larson's counsel asked if he "also had a deal with [Larson] for an interim period for $500 a month that [Larson] would rent [Schindewolf] a generator," Schindewolf responded, "Yes." (*Id.*). On re-direct examination, when Lump's counsel asked Schindewolf whether he accepted the quote Larson gave him for the sale price of a generator, Schindewolf responded, "It was to be – it was in the process. It was never accepted. It was never billed. To quote – it was still a quote." (*Id.* at 18).

{¶14} Next, Lump testified that he did not "know who [Larson] did business with" and that he did not "talk with anybody that [Larson] did business with." (*Id.* at 40-41). Lump also testified that he never tried to contact any of Larson's "clients or business relations." (*Id.* at 41). On cross-examination, Larson's counsel asked Lump, "Now, you testified on direct that you didn't know anything about any of [Larson's] business, any of his customers, anything like

that, right?" (*Id.* at 57). Lump responded, "I wasn't exactly sure. I saw people in and out. * * * I wasn't sure exactly what he done [sic]. I know he worked on generators and he was trying to get a patent for some fracking, but other than that, I didn't know what he was doing." (*Id.*). Lump testified that he did not know who Larson's customers were "until the lawsuit." (*Id.* at 57-58). According to Lump, after he read Larson's counterclaim against him, which referenced "Accelerated Moving & Storage" and "Schindewolf Trucking," Lump "tried to find all parties and inform them [he] did not deny [Larson] access and that they could come in and retrieve anything that they wanted to retrieve." (*Id.*); (Doc. No. 1).

{¶15} In his case, Larson called his son, Elijah Larson ("Elijah"), who testified that he heard Schindewolf and Larson "confirm a deal" under which Larson "would sell a generator to Schindewolf Express." (May 16, 2014 Tr. at 62). Elijah testified that he was present when Larson and Schindewolf "agreed to an interim rental agreement for another generator" at a price of $500 per month. (*Id.* at 63).

{¶16} Larson was the next to testify. (*Id.* at 64). According to Larson, he had "a business transaction, an agreed sale arrangement to Schindewolf Express." (*Id.* at 71). Larson testified that under that arrangement, which was for a total sale price of $19,181, Larson was to sell Schindewolf Express a generator and a transfer switch and install "all of the equipment for that generators [sic]." (*Id.*).

Defendant's Exhibit F, a July 2, 2013 "quote" letter from Larson to Schindewolf, contains a quote totaling $19,181, including a $17,880 base price and options described in the letter. (Defendant's Ex. F). According to Larson, he had an additional arrangement with Schindewolf under which he was "going to provide a rental generator in the interim until he could purchase the generator set" for a price of $500 per month. (May 16, 2014 Tr. at 71, 90).

{¶17} Larson testified that he had an agreement with Accelerated under which Larson "was providing a 750 KW generator set, a 1200-amp transfer switch, and the installation of both those items" for a total sale amount of $89,500. (*Id.* at 72). Larson testified that he had "another agreement with Accelerated" to "provide and install distribution equipment for a bio repository" for a total sale price of $415,000. (*Id.*). Larson identified Defendant's Exhibit C as a letter quoting Accelerated "a grand total of both those deals" of $510,350. (*Id.* at 73). Larson testified that he "enter[ed] into this transaction as outlined in * * * Exhibit C" but was not able to perform under those agreements because "Lump had [his] equipment locked up." (*Id.* at 74).

{¶18} Larson testified that in June, July, and August 2013, he told Lump "about [Larson's] deals." (*Id.*). According to Larson, he told Lump "about [his] business relationship with Accelerated." (*Id.* at 67). Larson testified, "It was very apparent that the two trucks right there that I was towing back to Columbus were

Accelerated's. He knew the engines were inside working on them. So, yes, he was very aware." (*Id.* at 67-68). Larson identified Defendant's Exhibit H as containing an email he sent to Lump on July 15, 2013, which was three weeks before Lump filed his complaint. (*Id.* at 75). In that email, Larson said, "I have spent the last three weeks retrieving and repairing a truck for Accelerated and am presently driving that truck to Salt Lake City, Utah and will deliver on Monday in Iowa City, being home late Wednesday." (Defendant's Ex. H). Lump did not respond to Larson's July 15, 2013 email. (May 16, 2014 Tr. at 75).

{¶19} Larson identified Defendant's Exhibit Q as his "damage report." (*Id.* at 84). Under the "Lost Profit" category of his damage report, Larson listed $50,000.00 "[l]ost profit from generator sale and installation, accelerated job" and $304,750.00 "[l]ost profit from distribution equipment and installation, accelerated job." (*Id.* at 89); (Defendant's Ex. Q). Larson agreed with his counsel that the total lost profit for both agreements was "about 354,000." (May 16, 2014 Tr. at 89-90). When Larson's counsel asked him if these figures represented "true profit above and beyond all of [his] expenses, cost of purchase, labor, overhead," Larson responded, "These are the true profit that I would have seen in those jobs." (*Id.* at 89). Larson also listed $12,000.00 "[l]ost profit from Schindewolf sale and installation" and $500.00 "[l]ost profit from rental generator, Schindewolf job (per month)." (*Id.* at 90); (Defendant's Ex. Q). Larson's counsel asked him if these

figures represented "true profit after all expenses and overhead and labor and everything is taken out," and Larson responded, "Yes, it is." (May 16, 2014 Tr. at 90).

{¶20} Finally, Larson called Todd Wilson ("Wilson"), owner and president of Accelerated, to testify. (*Id.* at 105). When Larson's counsel asked Wilson if he and Larson "enter[ed] into an agreement that [Larson] would sell [Wilson] these generators and provide services," Wilson responded:

> Actually, it wasn't a complete sale. * * * What we were looking to do was he already has the equipment; I already have the customers. We have customers that wanted a bio repository. Basically we were talking about an equity share of business * * *. We carved out an area for the bio repository to be relocated, but it never came to fruition.

(*Id.* at 110). Larson's counsel asked Wilson if the "$510,350 number" in Defendant's Exhibit C was "what [Wilson and Larson] agreed to in [their] arrangement," and Wilson responded, "That's what he talked about, right, yes." (*Id.* at 111).

{¶21} After trial, the parties submitted written closing arguments, and the trial court concluded in its judgment entry that Larson's tortious-interference-with-business-relationships "cause of action fails for several reasons." (Doc. No. 58).

We hold that the trial court's conclusion that Larson failed to prove tortious interference with business relationships is supported by some competent, credible evidence and therefore not against the manifest weight of the evidence.

{¶22} We begin with the "resulting damages" element of the tort. The trial court noted Larson's failure to adequately prove his damages, observing that Larson was "asking for the gross amount of these contracts and not what his damage would have been." (*Id.*). Regarding the purported generator-sale-and-installation agreement with Schindewolf, Larson testified that the total sale price was $19,181, and Defendant's Exhibit F, Larson's quote to Schindewolf, reflects that amount. Larson testified that the purported generator-rental agreement was for $500 per month. To prove his "lost profit" under these purported agreements, Larson relied only on the "damage report" he created, Defendant's Exhibit Q, and his testimony, which reflected a lost profit of $12,000 for the generator-sale-and-installation agreement and a lost profit of $500 per month for the generator-rental agreement. Regarding the two purported agreements with Accelerated, Larson testified that the total sale price of both was $510,350, and that amount is reflected in Defendant's Exhibit C, a "quote" letter from Larson to Wilson. To prove his "lost profit" under these purported agreements, Larson relied only on his "damage report," which reflected a total lost profit of $354,750 for both agreements, and his

-12-

testimony, in which he agreed his lost profit for both agreements was "about 354,000."

**{¶23}** This review of the evidence concerning damages reflects that, while Larson may have proven the gross amounts of the contracts with documents and corroborating information, he "merely assert[ed] that [he] would have made a particular amount of profits." *UZ Engineered Prods. Co.*, 147 Ohio App.3d 382, at ¶ 55. Indeed, Larson simply stated his lost-profit amounts without any itemization or explanation of how he calculated them. Moreover, Larson failed to "prove lost profits with calculations based on facts." *Id.* For example, Larson failed to offer any documents or information related to his cost basis in the equipment he was to sell under the agreements. Nor did Larson offer any documents or information related to his costs of providing the services under the purported agreements, such as transportation, labor, and installation costs. For these reasons, the trial court's conclusion that Larson failed to prove the "resulting damages" element of the tortious-interference-with-business-relationships cause of action is not against the manifest weight of the evidence.

**{¶24}** Larson's briefing on appeal reflects that he fails to grasp that "resulting damages" is one of the elements of the tortious-interference-with-business-relationships cause of action that he needed to prove to prevail on the

cause of action. Despite listing in his reply brief "damages resulting therefrom" as one of the elements of the cause of action, Larson states:

> The trial court did not award damages for Larson's Tortious Interference with Business Relationship claim because the trial court wrongly found that Larson sought the gross amount of the contracts rather than lost profits. * * * The trial court did not find that Larson failed to meet the elements of his Tortious Interference with Business Relationship claim.

(Appellant's Reply Brief at 1). At another point in his reply brief, Larson states, "The trial court did not hold that the elements of the tort were not met." (*Id.* at 2). Larson ignores the trial court's findings, analysis, and conclusion that Larson's tortious-interference-with-business-relationships "cause of action *fails* for several reasons." (Emphasis added.) (Doc. No. 58).

{¶25} We next address the "wrongdoer's knowledge of the relationship or contract" element of the tort. Although the trial court did not expressly rely on this element in its analysis, it did conclude that Larson's tortious-interference-with-business-relationships "cause of action fails for *several* reasons." (Emphasis added.) (*Id.*). Moreover, even assuming the trial court did not rely on this element of the tort in rejecting this cause of action, we affirm a trial-court judgment that is correct, but for a different reason. *Davis v. Widman*, 184 Ohio App.3d 705, 2009-

Ohio-5430, ¶ 16 (3d Dist.), citing *Advantage Bank v. Waldo Pub, L.L.C.*, 3d Dist. Marion No. 9-08-67, 2009-Ohio-2816, ¶ 46 ("[A] judgment by the trial court which is correct, but for a different reason, will be affirmed on appeal as there is no prejudice to the appellant."). Competent, credible evidence supports the conclusion that Lump did not possess the requisite knowledge of the relationship or contract.

{¶26} In support of their respective arguments concerning this issue, Lump and Larson unsurprisingly cite their own testimony. Lump testified that he did not know who Larson's customers were "until the lawsuit." Lump also testified that he "wasn't exactly sure" what Larson's business was. Larson testified that he informed Lump "about [Larson's] deals." Larson did not testify that he informed Lump of the Schindewolf agreements specifically, but he did testify that he told Lump "about [his] business relationship with Accelerated." Larson also points to Defendant's Exhibit H, email correspondence between him and Lump. While Larson mentioned "Accelerated" in one of his pre-lawsuit emails, he did so in the context of informing Lump of his whereabouts, simply mentioning that he repaired a truck for Accelerated in recent weeks and was driving it to Salt Lake City.

{¶27} While there is conflicting evidence concerning this element of the tort, the trial court was "in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflection, and gestures," and some

competent, credible evidence supports the conclusion that Lump did not possess the requisite knowledge of Larson's business relationships and contracts. *Warnecke*, 194 Ohio App.3d 459, at ¶ 13.

{¶28} For the reasons above, Larson's tortious-interference-with-business-relationships cause of action failed under at least two of the elements of that tort. We hold that that the trial court's judgment is supported by some competent, credible evidence and therefore not against the manifest weight of the evidence.[1]

{¶29} Larson's assignment of error is overruled.

{¶30} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**

---

[1] Not lost on us in Lump's failure to abide by the trial court's order to cooperate with Larson so that Larson could remove his personal property from the leased premises. The trial court found Lump in contempt of court and found that he failed to purge his contempt. (*See* Doc. No. 58). Our decision in this case is in no way an endorsement of Lump's disregard for the trial court's orders.