[Cite as *Bowers v. Brown*, 2026-Ohio-2365.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
ALLEN COUNTY


LEANNA BOWERS,

    PLAINTIFF-APPELLANT,

  v.

JAMES BROWN, JR.,

    DEFENDANT-APPELLEE.

CASE NO. 1-25-18


OPINION AND
JUDGMENT ENTRY


Appeal from Allen County Common Pleas Court
Trial Court No. CV 2023 0054

Judgment Affirmed

Date of Decision: June 22, 2026


APPEARANCES:

    *Kristina Coen* for Appellant

**ZIMMERMAN, P.J.**

{¶1} Plaintiff-appellant, Leanna Bowers ("Leanna"), appeals the April 15, 2025 judgment of the Allen County Court of Common Pleas dismissing her amended complaint against defendant-appellee, James Brown, Jr. ("Brown"), after finding that she is not entitled to any damages. For the reasons that follow, we affirm.

{¶2} On July 18, 2022, Leanna entered into a one-year lease agreement with Brown to rent a home located in Lima, Allen County, Ohio ("the property") for $889 per month. The lease agreement provided for the payment of a security deposit in the amount of $889.

{¶3} On or about July 22, 2022, Brown entered into a contract with the Allen Metropolitan Housing Authority ("MET Housing") whereby he agreed to accept monthly housing assistance payments of $889 on behalf of Leanna through the Section 8 housing choice voucher program. Brown's contract with MET Housing did not cover payment of the security deposit—Leanna was to pay the $889 security deposit directly to Brown.

{¶4} Shortly after Leanna took possession of the property, the relationship between the parties became acrimonious. Leanna was upset that repairs were not being made to the property—of particular concern was water and sewage in the

basement. In turn, Brown was upset that Leanna did not pay the security deposit and would not allow entry to the property to make repairs.

{¶5} On September 3, 2022, Brown served Leanna with a three-day notice to leave the premises for nonpayment of the security deposit. After Leanna did not vacate the property, Brown filed a forcible entry and detainer action. A hearing was held before a magistrate on September 28, 2022, wherein Brown represented himself and Leanna was represented by counsel. After being informed that Brown had agreed to accept housing assistance payments from MET Housing on behalf of Leanna, the magistrate stated that a 10-day notice was required and dismissed the case for failure to provide proper notice.

{¶6} Following dismissal of the forcible entry and detainer action, Leanna made complaints to Allen County Public Health, MET Housing, the City of Lima regarding the condition of the property.

**Allen County Public Health**

{¶7} On September 29, 2022, Ricky Welch, an environmental health specialist at Allen County Public Health conducted a site inspection of the property. Mr. Welch observed "what appears to be sewage and toilet paper solids pooling on the basement floor" and "sewer line missing the cleanout cap." (Plaintiff's Exhibit 3). Mr. Welch contacted Brown on September 30, 2022 regarding what he observed in the basement. Brown informed Mr. Welch that he had previously replaced the

cleanout cap on September 3, 2022. Brown further informed Mr. Welch that he would post a 24-hour notice of intent to enter the property to inspect the basement.

{¶8} At trial, Mr. Welch testified that Brown kept in "good contact" with him regarding the work performed at the property. (Mar. 28, 2024 Tr. at 57). On October 17, 2022, Brown advised Mr. Welch that he snaked the sewer line but could not get the cutting bit all the way through the line. Brown planned to use the city's camera to locate the blockage in the line. On October 18, 2022, Brown informed Mr. Welch that the city's camera spotted tree roots in the sewer line and that he planned to excavate the front yard. On October 26, 2022, Brown advised Mr. Welch that he disposed of the sewage in the basement and used bleach to clean the area.

{¶9} Because the drainage issue in the basement persisted, Mr. Welch sent a violation notice to Brown on November 9, 2022.

**MET Housing**

{¶10} On July 11, 2022, before Leanna took possession of the property, Cebron Butler, an inspector with MET Housing, inspected the property and found it to be habitable.

{¶11} On October 4, 2022, following a complaint made by Leanna regarding the condition of the property, Tony Azzarello, an inspector with MET Housing, inspected the property and found nine items to be repaired, including the missing cleanout cap on the sewer line in the basement.

{¶12} On October 25, 2022, Leanna made another complaint to MET Housing regarding the condition of the property. On October 28, 2022, Mr. Butler (the inspector who conducted the initial inspection of the property) inspected the property and found five items in need of repair. On November 1, 2022, Mr. Butler sent a letter to Brown setting forth the five items in need of repair, including the "basement drain should function as designed with no blockage (sewage and water backing up per tenant)." (Plaintiff's Exhibit 12). At trial, Mr. Butler testified that the purpose of the letter was to notify Brown that if he did not make the needed repairs to the property, the housing assistance payments from MET Housing "would cease." (Mar. 28, 2024 Tr. at 87).

{¶13} Mr. Butler inspected the property again on November 17, 2022 and found the same five items in need of repair, including the malfunctioning drainage system in the basement.

{¶14} On December 2, 2022, Mr. Butler sent an "abatement letter" to Brown stating that the December 2022 housing assistance payment on behalf of Leanna would not be made and that the contract with MET Housing would terminate 30 days thereafter. (*Id.* at 91).

**City of Lima**

{¶15} On November 8, 2022, Brandon Weigt, a code inspector with the City of Lima, inspected the property and observed "a small amount of standing sewage in the basement." (Mar. 28, 2024 Tr. at 62). Following his inspection of the

property, Mr. Weigt sent a letter to Brown listing 19 code violations found at the property. Many of the code violations involved the need to repair and maintain a sanitary drainage system. "Every plumbing stack, vent, waste and sewer line shall function properly and be kept free from obstructions, leaks and defects." (Plaintiff's Exhibit 19). The letter further stated that Brown must repair and/or replace the drainage system by November 13, 2022.

{¶16} Mr. Weigt inspected the property again on February 7, 2023, and observed four code violations related to the lack of a sanitary drainage system at the property. Mr. Weigt sent another letter to Brown stating that the violations needed to be corrected by February 12, 2023. At trial, Mr. Weigt explained that the February 7, 2023 letter is "telling the owner that there is an immediate need that needs to be addressed at the property" and "if it isn't addressed that I was going to deem the house uninhabitable." (Mar. 28, 2024 Tr. at 67). Mr. Weight posted a copy of the February 7, 2023 letter on the front door of the property, along with a sticker stating, "DANGER DO NOT OCCUPY." (Plaintiff's Exhibit 21). Mr. Weigt testified that, at this point, the property was not condemned, but "it was explained to the tenant that she was going to have to find somewhere to go." (Mar. 28, 2024 Tr. at 69).

{¶17} On cross-examination, Mr. Weigt testified that the first time he was at the property in November 2022 and inspected the basement "there was only a small little puddle of sewage." (*Id.* at 70). When he inspected the basement a second time

in February 2023, he could not walk all the way down the stairs to the basement due to "how much sewage was in the basement . . . [approximately] a foot or more." (*Id.*). Mr. Weigt further testified that Brown called him on multiple occasions to inform him of the attempts made to enter the property to make repairs. When asked on redirect examination what statements Brown made regarding the attempted repairs, Mr. Weigt explained as follows:

> He had tried to make repairs on - - on several occasions. Um, and when he called, he would - - he - - he basically said that he had to call the police out because the tenant and her boyfriend were screaming and yelling at him; shoving a video camera in his face. When I would then try to reach out to the tenant to explain 'Hey, you gotta let him try to make some of the repairs, you know. So that your house is - - is up to code.' She would - - she would say the exact same thing, you know. 'He's yelling - - he's yelling and screaming at me. I have to video tape because I don't feel safe here.' It was just a constant back and forth every time he did try to make a repair that it - - it just - - it was - - yea.

(*Id.* at 73-74).

{¶18} In the days following the posting of Mr. Weigt's February 7, 2023 letter, Leanna vacated the property.

{¶19} On February 13, 2023, Leanna filed a complaint for injunctive relief and damages in the trial court. On March 7, 2023, Leanna filed an amended complaint alleging the following claims: (1) violation of R.C. 5321.15(A); (2) violation of R.C. 5321.04(A)(7); (3) loss of use; (4) trespass and violation of R.C. 5321.04(A)(8); (5) invasion of privacy; (6) violation of R.C. 5321.02; (7) infliction of emotional distress; and (8) loss of wages.

{¶20} On June 1, 2023, Brown answered the amended complaint and counterclaimed for slander, past due rent, and damages for paying workers who were denied entry to the property. On November 27, 2023, the trial court dismissed Brown's counterclaim for slander.

{¶21} The matter proceeded to a bench trial on March 28-29, 2024, February 13-14, 2025, and March 10, 2025.

{¶22} On April 15, 2025, the trial court issued a judgment entry dismissing Leanna's amended complaint after finding that she is not entitled to any damages. The trial court also dismissed Brown's counterclaim.

{¶23} On May 14, 2025, Leanna filed a notice of appeal. Leanna raises four assignments of error for our review. For ease of discussion, we will address the assignments of error out of order. We note that Brown has not filed an appellee's brief or otherwise appeared in this appeal.

**Second Assignment of Error**

**The Court Erred When It Concluded That Brown Did Not Violate R.C. 5321.15(A) By Shutting Off The Water At The Property**

{¶24} In her second assignment of error, Leanna argues that the trial court's dismissal of her claim alleging a violation of R.C. 5321.15(A) is against the manifest weight of the evidence. Leanna asserts that "Brown engaged in self-help eviction when he shut off the water at the premises." (Appellant's Brief at 16). Leanna

further asserts that the trial court erred by finding that Brown did not engage in threats of unlawful acts for the purpose of recovering possession of the property.

*Standard of Review*

{¶25} "'When reviewing a civil appeal from a bench trial, we apply a manifest weight standard of review.'" *Lump v. Larson*, 2015-Ohio-469, ¶ 9 (3d Dist.), quoting *San Allen, Inc. v. Buehrer*, 2014-Ohio-2071, ¶ 89 (8th Dist.). "[A] civil judgment 'supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.'" *Warnecke v. Chaney*, 2011-Ohio-3007, ¶ 13 (3d Dist.), quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978).

{¶26} "'[W]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct.'" *Warnecke* at ¶ 13, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 24. "The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflection, and gestures." *Warnecke* at ¶ 13. "'A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court.'" *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 81 (1984). "'A finding of an error in law

is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.'" *Warnecke* at ¶ 13, quoting *Seasons Coal Co.* at 81.

*Analysis*

{¶27} The General Assembly enacted Chapter 5321 of the Revised Code—the Ohio Landlord-Tenant Act—in "'an attempt to balance the competing interests of landlords and tenants.'" *Mann v. Northgate Investors, L.L.C.,* 2014-Ohio-455, ¶ 10, quoting *Shroades v. Rental Homes, Inc.,* 68 Ohio St.2d 20, 25 (1981). Under the Ohio Landlord-Tenant Act, certain acts of a landlord are prohibited if residential property is involved. In its entirety, R.C. 5321.15 provides as follows:

> (A) No landlord of residential premises shall initiate any act, including termination of utilities or services, exclusion from the premises, or threat of any unlawful act, against a tenant, or a tenant whose right to possession has terminated, for the purpose of recovering possession of residential premises, other than as provided in Chapters 1923., 5303., and 5321 of the Revised Code.
>
> (B) No landlord of residential premises shall seize the furnishings or possessions of a tenant, or of a tenant whose right to possession has terminated, for the purpose of recovering rent payments, other than in accordance with an order issued by a court of competent jurisdiction.
>
> (C) A landlord who violates this section is liable in a civil action for all damages caused to a tenant, or to a tenant whose right to possession has terminated, together with reasonable attorneys fees.

{¶28} "R.C. 5321.15 expressly prohibits the use of 'self-help,' wherein a landlord attempts to evict a residential tenant without resort to legal procedure." *Burkholder v. Straughn*, 1998 Ohio App. LEXIS 2895, *6-7 (11th Dist. June 26, 1998). Moreover, "an award of reasonable attorney fees under R.C. 5321.15(C) is

mandatory when a court determines that a landlord has violated R.C. 5321.15(A) or (B)." *Crenshaw v. Rowland*, 2011-Ohio-5942, ¶ 16 (6th Dist.).

{¶29} In its April 15, 2025 judgment, the trial court found "no credible evidence that [Brown] had the water shut off *for the purpose of recovering possession of [the] premises*." (Emphasis in original.) (Doc. No. 112). Rather, the trial court determined that "[t]he water was shut off in [Brown's] unsuccessful attempts to fix the sewage problem." (*Id.*). The trial court further found "no credible evidence that [Brown] made threats for the purpose of recovering possession of the house." (*Id.*). The trial court explained,

> While it is clear that the parties in this case did not particularly like each other, there is no credible evidence that [Brown] made threats for the purpose of recovering possession of the house. Both [Brown] and [Leanna] were less than kind to each other, but the Court finds no credible evidence that [Brown] made a threat of any unlawful act against [Leanna].

(*Id.*).

{¶30} On appeal, Leanna argues that the trial court erred when it found no credible evidence to support her claim that Brown engaged in self-help eviction when he shut off the water at the property. According to Leanna, "[g]iven the totality of the circumstances, it is more likely than not that Brown had [the] water shut off in order to recover the premises, rather than to make repairs." (Appellant's Brief at 19). Leanna further argues that the trial court erred when it found no credible evidence that Brown made threats of unlawful acts for the purpose of

-11-

recovering possession of the property. Leanna asserts that the greater weight of the evidence shows that Brown violated R.C. 5321.15(A), thus entitling her to damages and an award of attorney fees under R.C. 5321.15(C). We disagree.

**{¶31}** In this case, evidence was presented to show that the water was shut off to the property in an attempt to repair the malfunctioning drainage system in the basement. In particular, James Rangel testified at trial that he was hired by Brown to remove water and sewage from the basement "and then do a general, rough, sanitization" of the basement. (Mar. 28, 2024 Tr. at 160). When Mr. Rangel first visited the property, there was approximately eight to ten inches of water and sewage in the basement. After cleaning out the basement, Mr. Rangel inspected the drainage system and observed "a Y with a cleanout cap that was broken off of that." (*Id.* at 159). Mr. Rangel explained that "anytime that anything was flushed or any kind of water would - - would be backed up, it came out of that Y[.]" (*Id.*). As to what he did after cleaning out the basement, Mr. Rangel testified as follows:

> I went upstairs, talked to the gentleman and said that, you know, "[Brown] and I are going to look into redoing some water drain systems down here. It's broke and it's currently not functioning and not working. So, if you so much as spit in the sink, it's going to come down into your basement. Please do not use any water until we get this figured out." Um, they kind of, uh, for a lack of better terms, didn't necessarily agree. So, I went downstairs, put a tie on it. Left it at that.

(*Id.* at 162-163). Mr. Rangel shut off the water to the property by placing "a nylon tie around the gate valve where the city meter comes into the house." (*Id.* at 162).

Mr. Rangel then contacted Brown to schedule an appointment to return to the property to repair the malfunctioning drainage system in the basement.

{¶32} On cross-examination, Mr. Rangel did not recall the approximate date he cleaned out the basement and shut off the water. When asked how much time elapsed between his first visit to the property and when he was scheduled to return, Mr. Rangel stated "it probably wasn't that long" and that the plumbing repairs would have been "taken care of in a day or so." (*Id.* at 168). On the day Mr. Rangel was scheduled to return to the property, Brown contacted him and told him not to come because there was four to five inches of water in the basement again.

{¶33} Based on our review of the record, we conclude that the trial court's finding regarding the purpose for the water shut off at the property is supported by some competent, credible evidence. *See C.E. Morris Co.*, 54 Ohio St.2d at 280 (stating that judgments supported by some competent, credible evidence will not be reversed on appeal as being against the manifest weight of the evidence). In particular, Mr. Rangel's testimony supports the trial court's finding that "the water was turned off to try to effectuate repairs." (Doc. No. 112). Thus, the trial court's finding is not against the manifest weight of the evidence.

{¶34} Leanna next argues that the trial court erred by finding that Brown did not threaten her with unlawful acts for the purpose of recovering possession of the property in violation of R.C. 5321.15(A). Leanna contends that "the record is replete" with Brown's threats of unlawful acts against her. (Appellant's Brief at

19). In support of this contention, Leanna points to testimony that Brown made false allegations of drug use against her, brandished a firearm at the property, and refused to make repairs to the property.

{¶35} Regarding the allegation of drug use, Leanna's caseworker at MET Housing testified that Brown reported seeing drug paraphernalia at the property on September 3, 2022. Leanna was not at home at the time Brown observed the drug paraphernalia. The caseworker explained that "the allegation was that it was a[t] her property but no, not necessarily tying it to her." (Mar. 28, 2024 Tr. at 114). Leanna's boyfriend testified that the "bongs" in the home were used for smoking tobacco and that Leanna used the measuring scale for "the vitamins for her boys." (Mar. 10, 2025 Tr. at 558-559).

{¶36} With respect to the allegation that Brown brandished a firearm at the property, Leanna testified that Brown "was walking through the house and like showed it off, pulled up his shirt brandishing it. So, I was scared." (Feb. 14, 2025 Tr. at 482). Leanna further testified that Brown carried a firearm "[e]very time" he was at the property. (*Id.*). Leanna stated, "I pointed it out to him and he said he's allowed to have a gun . . . that he's allowed to carry it." (*Id.*). Leanna's boyfriend also testified that Brown carried a firearm at the property:

> I can't remember every time, like specific dates, but there was at least
> a dozen times he was armed and there was a few time[s] he would, uh
> - - he wouldn't brandish it in his hand but he would make sure he lifted
> his shirt up so you would see it.

-14-

(Mar. 10, 2025 Tr. at 565).

**{¶37}** As to the allegation that Brown refused to make repairs to the property, Leanna testified that she denied Brown entry to the home "maybe three . . . [m]aybe four" times due to "[h]arassment." (Feb. 13, 2025 Tr. at 393-394). Leanna stated, "He was legally harassing me by posting inspection or - - or, uh, notices on my door for no - - no repair. I won't - - there was no point of doing inspections." (*Id.* at 394). Later in her testimony, Leanna increased the number to five or six times that she denied Brown entry to the home. "There's no reason he should want to come out there and want to inspect everything when it needs fixed." (*Id.* at 401).

**{¶38}** Additionally, Mr. Weigt (a code inspector with the City of Lima) testified that Brown contacted him on multiple occasions to inform him of attempts made to enter the property to make repairs. Mr. Weigt further testified that he spoke with Leanna about allowing Brown to enter the property to make repairs, but "[i]t was just a constant back and forth" between the parties. (Mar. 28, 2024 Tr. at 74).

**{¶39}** As the trier of fact, "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co.,* 10 Ohio St.3d at 80. Here, the trial court ultimately determined that "[b]oth [Brown] and [Leanna] were less than kind to each other" and found "no credible evidence that [Brown] made a threat of any unlawful act against [Leanna]." (Doc. No. 112). Based on our review of the record, we conclude that competent, credible

evidence exists to support the trial court's finding that Brown did not make threats of unlawful acts against Leanna.

**{¶40}** Leanna's second assignment of error is overruled.

### Third Assignment of Error

### The Court Erred When It Denied [Leanna's] Loss Of Use Claim

### Fourth Assignment of Error

### The Court Erred By Not Awarding Attorney's Fees, Actual, Nominal, Special or Punitive Damages To Plaintiff On Established Claims And Its R.C. 5321.15(A) Claim

**{¶41}** In her third assignment of error, Leanna argues that the trial court's dismissal of her claim for loss of use is against the manifest weight of the evidence. Leanna contends that she "lost full use of the [p]roperty . . . when she was forced to move out . . . as a result of Brown's breach of his statutory duties under R.C. 5321.04." (Appellant's Brief at 20).

**{¶42}** In her fourth assignment of error, Leanna argues that the trial court erred by not awarding her damages and attorney fees.

*Standard of Review*

**{¶43}** As previously stated, we review a civil appeal from a bench trial under a manifest-weight standard of review. *Lump*, 2015-Ohio-469, at ¶ 9 (3d Dist.). A civil judgment supported by some competent, credible evidence will not be reversed on appeal as being against the manifest weight of the evidence. *C.E. Morris Co.*, 54 Ohio St.2d at 280. In a bench trial, "the trial judge is best able to view the

witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co.*, 10 Ohio St.3d at 80.

*Analysis*

{¶44} The Ohio Landlord-Tenant Act sets forth the obligations of a landlord at R.C. 5321.04. In pertinent part, R.C. 5321.04 states as follows:

> (A) A landlord who is a party to a rental agreement shall do all of the following:
>
> (1) Comply with the requirements of all applicable building, housing, health, and safety codes that materially affect health and safety;
>
> (2) Make all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition;
>
> . . .
>
> (4) Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, and air conditioning fixtures and appliances, and elevators, supplied or required to be supplied by the landlord;
>
> . . .
>
> (6) Supply running water, reasonable amounts of hot water, and reasonable heat at all times, except where the building that includes the dwelling unit is not required by law to be equipped for that purpose, or the dwelling unit is so constructed that heat or hot water is generated by an installation within the exclusive control of the tenant and supplied by a direct public utility connection;
>
> (7) Not abuse the right of access conferred by division (B) of section 5321.05 of the Revised Code;

(8) Except in the case of emergency or if it is impracticable to do so, give the tenant reasonable notice of the landlord's intent to enter and enter only at reasonable times. Twenty-four hours is presumed to be a reasonable notice in the absence of evidence to the contrary.

(9) Promptly commence an action under Chapter 1923 of the Revised Code, after complying with division (C) of section 5321.17 of the Revised Code, to remove a tenant from particular residential premises, if the tenant fails to vacate the premises within three days after the giving of the notice required by that division and if the landlord has actual knowledge of or has reasonable cause to believe that the tenant, any person in the tenant's household, or any person on the premises with the consent of the tenant previously has or presently is engaged in a violation as described in division (A)(6)(a)(i) of section 1923.02 of the Revised Code, whether or not the tenant or other person has been charged with, has pleaded guilty to or been convicted of, or has been determined to be a delinquent child for an act that, if committed by an adult, would be a violation as described in that division. Such actual knowledge or reasonable cause to believe shall be determined in accordance with that division.

**{¶45}** The Ohio Landlord-Tenant Act further provides that "any party may recover damages for the breach of contract or the breach of any duty that is imposed by law." R.C. 5321.12. However, a party must present competent, credible evidence to prove damages. *See Price v. Brooks,* 2022-Ohio-2800, ¶ 19 (1st Dist.) (stating that damages must be shown with a reasonable degree of certainty and in some manner other than mere speculation, conjecture, or surmise). "It is for the trier of fact to determine the degree or amount of intrusion and loss of use for which the tenants will be compensated." *Cincinnati Ins. Co. v. Evans*, 2010-Ohio-2622, ¶ 54 (6th Dist.).

{¶46} In its April 15, 2025 judgment, the trial court determined that "[b]ased on everything presented, the Court finds no credible evidence that [Leanna] was damaged for the loss of use." (Doc. No. 112). In particular, the trial court found that Leanna "did not prove any damages resulting from the shut off of water, other than, perhaps, extreme inconvenience." (*Id.*). The trial court noted that Leanna "continued to live in the house" even though her caseworker at MET Housing testified that she "could have left the house temporarily without jeopardizing her voucher for public housing." (*Id.*). The trial court found as follows:

> [Leanna] said she had to rent a UHAUL and bought some boxes and cleaning supplies when she moved, but she did not support her self-serving testimony with any receipts. She was eligible for Section Eight housing when she left [the property].

(*Id.*).

{¶47} In her third assignment of error, Leanna argues that she is entitled to damages related to the "costs associated with moving her belongings on short notice, purchasing water for use in the home following the shut off, and costs associated with cleaning all of her clothing and household items to remove the odor of sewage." (Appellant's Brief at 22). In her fourth assignment of error, Leanna asserts that "[t]he damages should have been determined based on the witness testimony by [her] and her 11 witnesses and all exhibits submitted during trial." (*Id.* at 23).

{¶48} Leanna testified on direct examination that she was without water at the property for "about a month and a half, maybe two months." (Feb. 13, 2025 Tr.

at 303). After the water was shut off, Leanna testified that she "got water from [her] neighbor" and "went out to Walmart and bought distilled water to use for cooking and dish purpose[s]." (Feb. 14, 2025 Tr. at 454). Leanna further testified that she spent "about thirty dollars a week" on water. (*Id.* at 459). However, when questioned on cross-examination about how much she spent, Leanna stated, "I don't quite remember how much I spent on water. I just know I had to buy water and I also got water from my neighbor." (*Id.* at 504). Leanna also testified that she stayed with her mother for a period of time when the water was shut off. Leanna stated as follows:

> I had to figure things out and go stay with my mother through the time period. I only stayed a week or two at my mother's because I had a home to - - I had to be at home because of the notices and the harassment. So, I had to be there to record or to video what was going on. So, me and my children did have to endure not having water. And my neighbor was a good help.

(*Id.* at 452).

{¶49} Leanna further testified that she incurred out-of-pocket expenses related to heating the property. Leanna stated that she spent $25.00 to purchase a space heater. When asked if her electric bill increased due to using the space heater, Leanna replied, "Um, most likely but I was on PIPP at the time. I know at one point

in time my electricity went up to eight hundred and something a month. It was high up there."[1] (*Id.* at 460).

{¶50} Leanna vacated the property sometime in February of 2023. As to her moving expenses, Leanna testified that she had "to get a U-Haul" and "I think it was a hundred dollars." (Feb. 14, 2025 Tr. at 460). Leanna further testified that she purchased "boxes and tape" for "I wanna say about forty bucks." (*Id.* at 461). She also testified that she bought "Mr. Clean to mop the floors and the walls, to wipe them down." (*Id.*). Leanna estimated the cost of the cleaning supplies to be "[a]bout twenty bucks." (*Id.*).

{¶51} Even though Leanna did not vacate the property until February of 2023, her caseworker at MET Housing testified at trial that, effective December 1, 2022, she was eligible for a new housing choice voucher due to the rent abatement at the property. The caseworker further testified that, prior to December 1, 2022, Leanna could have temporarily vacated the property without losing her housing assistance. The caseworker explained as follows:

> A temporary leave would have never been a problem. I remember, and I looked at my notes earlier today, advising that you could seek temporary shelter somewhere else. It's only when you want to be away for more than thirty days that we would need to give you approval.

---

[1] The Percentage of Income Payment Plan, commonly known as PIPP, "is an energy program that provides assistance to low-income residential customers who are unable to pay the full price of natural-gas or electric service." *Toliver v. Vectren Energy Delivery of Ohio, Inc.*, 2015-Ohio-5055, ¶ 1. "As the program name implies, most PIPP customers pay a fixed percentage of their monthly income instead of the actual cost of service." *Id.*

(Mar. 28, 2024 Tr. 103).  Moreover, Leanna testified at trial that she continues to receive assistance through the Section 8 housing choice voucher program.

**{¶52}** As the trier of fact, "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co.,* 10 Ohio St.3d at 80.  Here, the trial court ultimately determined that Leanna failed to present competent, credible evidence to prove damages for loss of use. *See Price,* 2022-Ohio-2800, at ¶ 19 (1st Dist.).  The trial court found that Leanna "continued to live in the house" and maintained her housing benefits after she vacated the property.  (Doc. No. 112).  Based on our review of the record, we conclude that the trial court's decision is supported by some competent, credible evidence and, therefore, not against the manifest weight of the evidence.  We further conclude that an award of attorney fees is not warranted due to Leanna's failure to establish damages.  *See Price* at ¶ 20 (stating that an award of attorney fees is not warranted if a tenant is not awarded damages for a violation of the Ohio Landlord-Tenant Act).

**{¶53}** Leanna's third and fourth assignments of error are overruled.

**First Assignment of Error**

**The Court Erred When It Inaccurately Applied The Facts To The Law Against The Manifest Weight Of The Evidence**

-22-

{¶54} In her first assignment of error, Leanna argues that "[t]he sheer number of factual errors contained in the Judgment Entry show[s] that the Court's decision is against the manifest weight of the evidence." (Appellant's Brief at 13).

*Standard of Review*

{¶55} Again, a civil judgment supported by some competent, credible evidence will not be reversed on appeal as being against the manifest weight of the evidence. *C.E. Morris Co.*, 54 Ohio St.2d at 280. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court." *Seasons Coal Co.*, 10 Ohio St.3d at 81. "A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Id.*

*Analysis*

{¶56} Leanna argues the trial court's April 15, 2025 judgment is against the manifest weight of the evidence due to several "factual errors" made by the trial court. (Appellant's Brief at 13). Specifically, Leanna claims that the trial court "ignor[ed] the severity and duration" of the sewage problem and misconstrued the evidence when it found that Brown attempted to fix the problem. (*Id.*).

{¶57} We are mindful that, in a bench trial, "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."

*Seasons Coal Co.* at 80. Moreover, a reviewing court should not reverse a trial court's judgment as being against the manifest weight of the evidence if the judgment is supported by some competent, credible evidence. *C.E. Morris Co.* at 280.

{¶58} In this case, the trial court heard testimony from Mr. Welch (an environmental health specialist at Allen County Public Health) regarding his communications with Brown and the attempts made to fix the sewage problem at the property. Brown informed Mr. Welch that he replaced the missing cleanout cap on the drainage system in the basement on September 3, 2022. When the sewage problem persisted, Brown snaked the sewer line and encountered a blockage. Brown then used the city's camera to locate the blockage.

{¶59} Willie Whiteside testified at trial that he was hired by Brown to "get [the sewer line] unclogged." (Mar. 28, 2024 Tr. at 150). After the city's camera found that the sewer line was clogged "by a big tree," Mr. Whiteside excavated around the area but did not find any tree roots or problems in the sewer line. (*Id.*). Mr. Whiteside then used a "new machine" to push water through the line and "shot" the blockage out and "opened it up." (*Id.*).

{¶60} Mr. Rangel also testified at trial that he was hired by Brown to remove water and sewage from the basement. After he cleaned out the basement, Mr. Rangel inspected the drainage system and observed "a Y with a cleanout cap that was broken off of that." (*Id.* at 159). Mr. Rangel testified that he contacted Brown

to schedule an appointment to return to the property to repair the malfunctioning drainage system in the basement.

**{¶61}** Brown also testified at trial that he "rent[ed] an eel twice" and "eeled out the basement a few times." (Mar 10, 2025 Tr. at 581). Brown explained,

> I was putting up 24-hour notices, going over there every other day trying to figure out what was going on. That's why we were there so many times with going in the basement and someone outside. Trying to figure out where the water is coming from. We dug a hole at least eight feet deep. We still did not strike a water line. Um, so, the guy said he would fix it from the inside. I called him out and got a[n] estimate. They were going to do it. Uh, they - - they drained the basement out. It cost me eleven hundred dollars.

(*Id.* at 581-582). On cross-examination, Brown was asked, "So, what specifically did you do to fix the sewage issue?" (*Id.* at 601). Brown replied,

> First, like I say, we snaked it out. We did that. Um, maybe a month or so later they had a problem again. This time it was coming up sewer water. The first time it was fresh water. This time is was sewer water. Um, we tried to run a snake again. The water did go down. We ran it twice. It did go down. They called back again and said they smelled sewage. So, I went - - came over. I poured bleach down the drain. They turned the water on and she said well give it about five minutes. And, um, all I said was it was going to come up in the basement, don't run it. I'll just have a guy come fix it. So, we come over, uh, later to fix it and the water's probably, I'd say two feet deep in my basement of water. We couldn't get down there. Uh, that's when Pride came out and did what they had to do.

(*Id.*).

**{¶62}** Based on our review of the record, we conclude that competent, credible evidence exists to support the trial court's finding that Brown attempted to fix the sewage problem. *See C.E. Morris Co.*, 54 Ohio St.2d at 280. We further

-25-

conclude that the trial court's decision is not against the manifest weight of the evidence. The trial court was in the best position to weigh the credibility of the witnesses and resolve questions of fact. *See Seasons Coal Co.,* 10 Ohio St.3d at 80. Moreover, a difference of opinion on credibility of witnesses and evidence is not a legitimate ground for reversal. *See id.* at 81.

**{¶63}** Leanna's first assignment of error is overruled.

**{¶64}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**MILLER and WILLAMOWSKI, J.J., concur.**

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. *See* App.R. 30.

_____
William R. Zimmerman, Judge

_____
Mark C. Miller, Judge

_____
John R. Willamowski, Judge

DATED:
/hls